# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-1204

STATE OF LOUISIANA

VERSUS

FRANCIS BROWN

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 06-K-2644-B
HONORABLE ELLIS J. DAIGLE, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, J. David Painter, and Shannon J. Gremillion, Judges.

AFFIRMED.

G. Paul Marx
Louisiana Appellate Project
P. O. Box 82389
Lafayette, LA 70598-2389
Telephone: (337) 237-2537
COUNSEL FOR:
    Defendant /Appellant - Francis Brown

Earl B. Taylor
District Attorney, 27th Judicial District Court
Jennifer Ardoin
Assistant District Attorney, 27th Judicial District Court
P. O. Drawer 1968
Opelousas, LA 70571
Telephone: (337) 948-0551
COUNSEL FOR:
    Plaintiff/Appellee - State of Louisiana

**THIBODEAUX, Chief Judge.**

The Defendant, Francis Brown, appeals his conviction for second degree murder. He asserts that the evidence was insufficient to prove guilt; that the trial court made erroneous evidentiary rulings on his alternative theories of the crime's commission and impeachment of the State's witnesses; and erred in failing to declare a mistrial because of an improper jury verdict.

We conclude that these assertions are meritless and affirm the Defendant's conviction.

### Insufficiency of the Evidence

Defendant contends that, although the State proved he had been with the victim at some point, the prosecution failed to prove he was the one who committed the crime. Defendant further claims the State failed to exclude the reasonable hypothesis that someone else committed the murder.

The prosecution responds that there was a substantial mass of both direct and circumstantial evidence against Defendant. It correctly points out that the evidence, when viewed in a light most favorable to the prosecution, was sufficient to establish Defendant's guilt beyond a reasonable doubt.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) . . . . A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

At the time of the offense, second degree murder included "the killing of a human being: (1) when the offender has a specific intent to kill or to inflict great bodily harm . . . ." La.R.S. 14:30.1.

The evidence, when viewed in the light most favorable to the prosecution, shows that Defendant and the victim had recently ended a romantic involvement, but they were still arguing over rumors of the victim's infidelity. In the time leading up to the victim's death, Defendant persistently attempted to maintain telephone contact with the victim, and the victim was heard arguing with Defendant over the phone late in the night on May 8, 2006, and into the early morning of the following day. Around 2:00 a.m. on May 9, 2006, the victim reluctantly allowed Defendant to enter her home. The victim's sister observed Defendant was wearing blue-jean shorts and a white T-shirt.

An hour later, at around 3:00 a.m., Robin Gradnigo and Jordan Gradnigo, residents of Azeline Drive, heard a woman's loud screams. These witnesses testified that the screams sounded as if someone was being killed. The Gradnigos decided to drive up and down the street, looking and listening unsuccessfully for whoever had been screaming. They returned home around 3:12 or 3:15 a.m.

Reginald Laviolette and his parents, who also lived on Azeline Drive, were awakened by a woman's screams thirty minutes to an hour after the Gradnigos had been awakened in the same manner. Although his parents went back to sleep, Mr. Laviolette decided to look outside. Mr. Laviolette, who wore trifocals, could not see clearly without his glasses. Nonetheless, he saw a male and a female outside;

2

when the woman pleaded for help, the male told her to "quit tripping." Mr. Laviolette went back to bed when the couple moved away from his house.

At around 4:00 a.m., Brandon Lastrapes, who also resided on Azeline Drive, was awakened by a loud female scream. Mr. Lastrapes observed a skinny man, who wore dark blue shorts, a white T-shirt, and dark jacket, hit and pull a female. The male was hitting the female on the head. Mr. Lastrapes went back to bed without calling the police. Mr. Lastrapes also said that he saw the same man around 6:30 a.m. riding a bike on the road without the female. Mr. Lastrapes could not positively identify Defendant as the perpetrator from the photographic line-up, but he indicated Defendant's picture as appearing similar to the perpetrator. At trial, Mr. Lastrapes could not identify which photo he had chosen.

Shane Eaglin, who lived on Gilbert Drive, along with his girlfriend, Brandy Semien, heard a girl screaming for help from Azeline Drive at 5:15 a.m. Mr. Eaglin had just returned home from his trip to a gas station. Mr. Eaglin walked into his backyard, where he could see Azeline Drive, and he observed a male beating a female on the head and dragging her by the hair. The female was on the ground, crying, and insisting she could not get up. Mr. Eaglin observed the man wore a white T-shirt and blue shorts. Mr. Eaglin stated he did not know the man, but he saw the man hiding in the field one night, and the man asked Mr. Eaglin where the man's girlfriend lived. Mr. Eaglin replied that he did not know. Both at trial and in the photographic line-up, Mr. Eaglin, who had been standing nine to twelve feet away from the couple, positively identified Defendant as the perpetrator.

On cross-examination, the defense asked Mr. Eaglin about the scar he had reported as being on the face of the perpetrator. After reviewing his police statement, Mr. Eaglin agreed the man had a scar on his left cheek instead of his right.

At trial, Mr. Eaglin could not see the scar on Defendant who was standing nine to twelve feet away from him. Mr. Eaglin further testified that he had not been under the influence of any medication, and he had one beer on the evening of the offense.

Mr. Eaglin's girlfriend at the time, Ms. Semien, also observed the male and female, but she saw them from approximately three times the distance as Mr. Eaglin. Ms. Semien saw the male beating the female and physically silencing her screams. When the man stood beneath a street light, Ms. Semien recognized him as someone she had seen on a bicycle in that area on two prior occasions.

Ms. Semien explained that she persuaded Mr. Eaglin to go inside because he did not know what was going on and could get killed. She also explained that she did not call the police because she had been in many situations where a woman (including her own mother) screams "bloody murder" but the next day the woman and her boyfriend would hug and kiss each other. Ms. Semien stated that this experience taught her to mind her own business.

When they heard that Shaquanda had died, Mr. Eaglin and Ms. Semien contacted the police. Both stated that they did not read the paper nor watch the news. Ms. Semien did not know there had been a reward offered for information in the case. Ms. Semien picked the Defendant out of the photographic line-up. She also recalled that the perpetrator had braids and light colored lips.

On cross examination, Ms. Semien estimated thirty feet as her distance from the perpetrator. She stated that she was close enough to see the perpetrator's face under the "big street light covering where they were." Ms. Semien also recalled telling the police that the perpetrator had a scar on the left side of his face, and that she could sometimes see some features on a person's face when light flares. Ms. Semien confirmed Mr. Eaglin's trip to the gas station to purchase beer, but testified

4

that neither she nor Mr. Eaglin had been drinking that evening. Ms. Semien, who was questioned simultaneously with but separately from Mr. Eaglin, also positively identified Defendant as the perpetrator when she was presented with a photographic line-up.

An hour to an hour and a half later, the victim was discovered nearby lying face down in an ant bed. She was unconscious, battered, and covered in ant bites, but she was still breathing. Examination at the hospital determined Shaquanda had suffered brain death from a severe blow to her head. The victim had Defendant's saliva on her shirt consistent with the locations of bite marks found on her shoulders. A white T-shirt recovered from the crime scene tested positive for Shaquanda's DNA and excluded all of the known suspects except Defendant. Analysis of the shorts Defendant was wearing during the time of the offense showed that the article of clothing was spotted with the victim's blood. Despite Defendant's earlier persistence in calling Shaquanda, he did not attempt to contact her on the phone from the time of the incident until his arrest.

In *State v. Hansbro*, 35,027, pp. 9-10 (La.App. 2 Cir. 9/26/01), 796 So.2d 185, 192-93, *writ denied*, 01-2970 (La. 10/25/02), 827 So.2d 1177, the second circuit found sufficient evidence to convict the defendant of beating the victim to death. The record showed that the victim in the case had been repeatedly beaten and stomped. *Id*. at 193. The fatality was caused by multiple fractures to the skull, but the blows also broke all of the victim's ribs and caused serious injuries to the victim's face and neck. *Id*. The evidence placed the defendant at the scene of the homicide at the time of the homicide; he had both his and the victim's blood on his clothing; the victim bore the imprints of the defendant's shoe on his face and neck; a witness

said he saw the defendant beat and rob the victim; and the defendant also admitted to someone he had beaten and possibly killed someone. *Id*. at 194.

When the evidence in this case is viewed in the light most favorable to the prosecution, the State proved beyond a reasonable doubt that Defendant beat the victim over a two to three hour period, which shows the specific intent to inflict great bodily harm, and that Shaquanda died as a result of the injuries sustained during the beating.

## Alternative Theory of Crime

Defendant urges that the trial court erred in prohibiting him from presenting a theory of the crime alternate to that argued by the prosecution:

> The Trial Court erred in restricting the defense['s] effort to show that some other person killed Richard, by barring the defense from presenting evidence of past difficulties and fights Richard had at school before her death, and potential "other dudes" who may have committed the crime. This evidence included evidence of threats against the victim. The trial court's ruling that such evidence is "irrelevant" is reversible error, for any exculpatory evidence cannot be irrelevant.

Defendant asserts that the record clearly reveals the defense had information concerning the deceased's fights at the school involving other people, and the exclusion of that information was prejudicial error. Defendant alleged that one of the young women involved in such a fight stated she wanted the victim and her baby dead. Defendant contends that this information raises serious doubts about the reliability of the verdict in this case.

The State replies that its objection to the evidence was not only irrelevance but also to the hearsay nature of the evidence and to the manner in which the defense was attempting to introduce the evidence. The State contends the manner of introduction complied with neither the Louisiana Code of Evidence nor the rules

6

set forth by jurisprudence. The prosecution continues that the trial court properly sustained its objection.

The State first urges that any incidents at school involving another party are irrelevant because it is overreaching to implicate another party simply because they argued with the victim. The prosecution alleges that, considering the evidence implicating Defendant as the offender, any attempt to implicate another party was "nothing more than a 'bare suspicion' [and 'conjectural inference'] used to cast the shadow of guilt against the Defendant to another person and is inadmissible as determined by prior jurisprudence."

The State next urges that the evidence was inadmissible hearsay. The prosecution avers the witnesses neither encountered nor overheard the argument. The State asserts the proper method for introducing the evidence would have been to call to the stand the person who made the threatening remarks and to then call other witnesses to testify otherwise if that person denied the threat.

During the presentation of the defense, defense counsel asked Randolph Lorah, who was a detective with the St. Landry Sheriff's Office on the date of the homicide, "Did any investigation that you did reveal that there was a fight at Opelousas Senior High School?" The State objected to the relevance of the question. During a sidebar conference the parties argued the objection, and the district court sustained the objection.

Additionally, during the State's case-in-chief, defense counsel also asked Shaquanda's sister, Ms. Richard, "Are you familiar with the incident that happened at OHS?" The prosecutor objected, and both the witness and the jury were removed from the courtroom.

7

The district court sustained the State's objection to the questions on the basis of inadmissible hearsay. Hearsay, in general, is inadmissible. La.Code Evid. art. 802. No prior evidence was admitted regarding an incident at the high school, the inquiries did not specifically ask whether the witnesses had been present at the incident, and during the presentation of its case, the defense did not call the participants in the incident or any witnesses to testify on Defendant's behalf. Because the defense's questions seemed to ask both Mr. Lorah and Ms. Richard whether they were aware of an occurrence outside of their personal knowledge, the queries were hearsay. La.Code Evid. arts. 602, 801. Defendant does not argue that the witnesses had personal knowledge of the event or that the evidence falls into an exception to the hearsay rule.

Moreover, the bare questions asking the witnesses whether they had heard about a fight at the high school the victim attended where the query, as posed, called for a simple yes or no answer does not "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. Thus, the question, by itself, was not relevant.

Defendant alternatively urges that the trial court's ruling violated due process as it prevented him from presenting evidence that another person wanted the victim dead. "[I]n order to preserve the right to appeal a trial court ruling which excludes evidence, the defendant must make the substance of the evidence known to the trial court." *State v. Stevenson*, 02-79, p. 6 (La.App. 5 Cir. 4/30/02), 817 So.2d 343, 347. However, the defense neither introduced nor proffered evidence during trial showing that someone other than Defendant threatened Shaquanda's life or wanted her dead. La.Code Crim.P. art. 841; La.Code Evid. art. 103.

8

Defendant's contentions are meritless.

## Impeachment of State's Witnesses

The defense asserts the trial court erred in prohibiting it from asking certain questions it wanted to ask to impeach some of the State's witnesses:

> The Trial Court erred when the defense was barred from impeaching witnesses on cross. The Defense was barred from grilling Shane Eaglin on his sobriety and his story about Brown asking directions, and Brandy Semien on her motive in testifying. The Defense also was barred from asking Randolph Lorah details on his firing by the Sheriff for malfeasance.

Defendant posits that the trial court's refusal to allow this impeachment evidence undermined the "moral force" of his defense. Defendant argues that, therefore, he has been denied a fair trial.

The defense first contends the district court erred in sustaining an "argumentative" objection to his question, "And you want this jury to believe that you saw this man. . . ." Defendant contends the question was asked immediately after the defense established an eyewitness inaccurately described Defendant as having a scar on the left side of his face and as having been more than thirty feet away from the man beating the victim. The defense asserts that this was an improper ruling.

The State responds the question was argumentative as it was worded because it required the witness to comment on what the jury was to believe from the witness's testimony. The prosecution points out that defense counsel could have rephrased the question and asked it again, but he did not. The State further asserts that, even though Defendant claims the question went to the witness's motive for testifying, the evidence was still admitted because she had earlier stated she came forward because she heard the girl had died. The prosecution asks this court to find the trial court's ruling to be either correct or harmless error.

The record shows the defense asked this question during its cross-examination of Ms. Semien. Defense counsel began the question after Ms. Semien described the distance she approximated to be between her and the struggle by giving a relative distance in the courtroom and after defense counsel verbalized the distance to be around thirty feet. The record reveals the following exchange:

A.    And you want this jury to believe that you saw this
--

      **MR. RICHARD:**   Objection. That's argumentative on the face of it.

      **THE COURT:**  Sustained.

**MR. CLAIBORNE CONTINUES:**

Q.    And you saw this so-called scar over thirty feet away at 4:00 a.m. in the morning.

A.     Yes.

Thus, in context, it appears the question was asked to express defense counsel's incredulity at the witness being able to see details of Defendant at thirty feet. The remark shows defense counsel did, in fact, rephrase the question, and the witness answered affirmatively without objection by the State.

The supreme court has previously held that, when an objection was sustained to an argumentative question, any error in disallowing the question was harmless if the question was rephrased, permitted, and had received a response. *State v. Toomer*, 395 So.2d 1320, 1333 (La.1981) (citing La.Code Crim.P. art. 921; *State v. Marcal*, 388 So.2d 656 (La.1980), *cert. denied*, 451 U.S. 977, 101 S.Ct, 2300 (1981); *State v. Walker*, 344 So.2d 990 (La.1977)). Therefore, any error by the trial court in sustaining the State's objection was harmless.

Defendant further complains the trial court improperly sustained the State's objection when the defense asked one of the State's witnesses whether he could pass a drug test at the time of his testimony.

The State contests Defendant's argument by stating that, under La.Code Evid. arts. 607-609.1, such questions are prohibited as the answer would have constituted other crimes evidence that was not a felony conviction.

"Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required." La.Code Evid. art. 608(B). Although every witness testifying subjects himself to questioning regarding his criminal conduct, "only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal." La.Code Evid. art. 609.1.

The question asked by defense counsel constituted a query into a possible vice of the witness; there had been no prior evidence introduced showing the witness had a drug habit, and there was no evidence introduced at trial showing Mr. Eaglin had ever been arrested for drug possession. Therefore, the trial court did not err in sustaining the State's objection to the question.

When the defense asked whether Mr. Eaglin had learned Defendant already knew how to get to the victim's house, the trial court sustained the prosecution's objection in that the question required the witness to conclude what Defendant knew or did not know; Defendant urges the trial court's ruling was error.

11

The State counters that its objection was based on the question's call for the witness to speculate as to what knowledge Defendant had or did not have. The State postulates there could have been any number of reasons Defendant asked the witness if the witness knew where the victim lived. The prosecution maintains the trial court properly sustained its objection and points out the defense failed to rephrase and re-ask the question.

In cross-examining Mr. Eaglin about Defendant asking him the location of Shaquanda's house, defense counsel asked, "Did it ever come to your attention that he had been dating Shaquanda for some time prior to May 9th and he knew how to get to her house?" The State objected, "That calls for a conclusion on the part -- wait, wait, Mr. Eaglin. That calls for a conclusion on the part of this witness as to what that person knew or didn't know." When the trial court sustained the objection, defense counsel continued on to the next question without objecting to or commenting on the ruling.

Under La.Code Evid. art. 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." A lay witness's "testimony in the form of opinions or inferences is limited to those opinions or inferences which are: (1) rationally based on the perception of the witness; and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." La.Code Evid. art. 701.

In this case, Mr. Eaglin testified he did not know Defendant, so Mr. Eaglin would not have had personal knowledge of what Defendant did or did not know. Thus, both the information requested by the question and the knowledge upon

12

which any reasonable inference or opinion could be based were outside of Mr. Eaglin's personal knowledge. Therefore, the trial court did not err in sustaining the State's objection.

Defendant contends the district court additionally erred in refusing to allow the defense to have a copy of Mr. Lorah's employment file and in barring the defense from asking Mr. Lorah "details of his firing by the Sheriff for malfeasance," which required the defense to rely solely on Mr. Lorah's truthfulness in describing his dismissal from the sheriff's office for malfeasance. Defendant alleges this would have been important because the defense questioned Mr. Lorah why he never followed up on an eyewitness's statement that the man seen beating the victim was another man instead of Defendant. Defendant asserts the termination papers, therefore, could have contained critical impeachment evidence.

The State responds that the district court made an *in camera* inspection of the file and determined there was nothing relevant to the case and that the trial court further indicated it would allow the defense to introduce Mr. Lorah's application for unemployment benefits into evidence at trial because it was public record. The prosecution also claims that both parties were allowed to ask questions regarding his being fired from the sheriff's office, which questions Mr. Lorah answered in detail. The State urges that the trial court's decision was correct.

We cannot find error in the trial court's refusal to provide the defense with a copy of Mr. Lorah's employment record because it was not proffered into evidence. Thus, it is not available for review. Further, Defendant does not assign error to the trial court's refusal to allow the proffer.

Moreover, contrary to Defendant's assertion that he "was barred from asking Randolph Lorah details on his firing by the Sheriff for malfeasance," the

13

record shows Defendant cross-examined Mr. Lorah at length about his dismissal from the Sheriff's Office. The record clearly demonstrates that defense counsel was allowed to ask detailed questions regarding Mr. Lorah's termination.

**Mistrial**

Defendant maintains he was entitled to a mistrial: "The Trial Court erred in that a Mistrial should have been granted when the written poll of the jury on the verdict showed there may have been only 9 votes for guilt, even though a verbal poll came out unanimous." Although Defendant was only charged with one offense, the jurors were given slips marked with a list of counts one and two, and three of the slips were mis-marked. Defendant urges that this could have meant that the vote was nine to three, which would have been fewer than the number of votes required to return a guilty verdict.

The basis for this assignment of error arose after the jury's guilty verdict. The defense moved for individual polling of the jurors, and in response, the trial court distributed individual verdict sheets and explained that they were to individually indicate their vote:

> You will indicate as shown here, "Is this your verdict?" You will say "yes" or "no" and there is a spot for "yes" or "no." That's all you have to "X" is the "yes" or "no," and then the bailiff will pick up those sheets and I will tabulate them.

When the forms were returned, the district court concluded there had been a unanimous verdict. After both parties were allowed to review the verdict sheets, the defense pointed out possible irregularities in some of the forms and objected thereto.

Noting Defendant's objection, the trial court told the jurors they would receive fresh sheets and, this time, the jurors were only mark "yes" or "no" for Count I. At this time, the defense interjected and requested a discussion in chambers. The

14

subsequent discussion began with the prosecutor setting forth what had happened with the jury polling sheets:

> **MR. RICHARD:** What happened was the Court handed counsel and I the twelve slips. The slips had been prepared with two counts, Count I and Count II, which [sic] a "yes" or "no" for each one of them. As the Court noted, there is only one count in this indictment, and there were three anomalous, if you will, slips. . . . and on three of those, three of the jurors marked "yes" on both Count I and Count II.

The district court clarified that, on one of the three slips, the juror had attempted to erase the "yes" marked for Count II.

The defense then argued that the jurors marking "yes" for both counts had indicated they had voted for both second degree murder and manslaughter. The prosecution objected to Defendant's characterization because there had been four responsive verdicts and only two counts listed on the form. The trial court responded that there had been no second count, that the jurors had been asked to mark "yes" if they had voted for second degree murder, that any other vote would have been indicated by a "no," and that all of the slips had been marked "yes."

The defense elaborated on its initial argument:

> **MR. CLAIBORNE:** From the slips that were passed out, three jurors marked Count I and Count II, that's the bottom line, and I don't think that that is in conformity with whatever the verdict is or what their intentions are and I do not think it's appropriate -- I realize the Court was about to instruct them to mark those slips of second degree murder, and I do not think it's appropriate for the Court to advise them to mark those slips second degree murder. They could have easily could have been trying to find my client guilty of a lesser and included offense, and I just don't think it's very clear of intent of those jurors, whomever they are, and we don't know who they are, and if, you know, we go back in there and say, mark second degree murder just because the verdict form was signed second degree murder, there may some people who wanted a lesser and included offense. That's all I'm trying to say, I mean, we can speculate all day as to what their thoughts

15

were in this matter, and under the circumstances, you know, I don't know how the thing should be cured. I just don't think it's in conformity with --

The district court interrupted to assert it had never advised the jurors to mark second degree murder.

After the defense moved for a mistrial and the trial court denied the motion, the district court explained it would ask each juror individually what his vote had been. When the parties returned to the courtroom, the trial court explained it would ask each juror if he had voted Defendant to be guilty of second degree murder: "Ladies and gentlemen of the jury, I am going to ask you whether or not you voted guilty to second degree murder as indicated on the verdict from that was signed by the foreperson, Alex T. Frank, on December 19, 2007. You will respond orally to me." When the district court called them individually by name, each juror responded, "Yes." The district court held the verdict had been unanimous: "All twelve jurors have responded affirmatively that they voted for second degree murder. Therefore, it's a unanimous verdict."

In *State v. Cook*, 396 So.2d 1258, 1360-61 (La.1981), the supreme court discussed the importance of the jury poll when it is needed to clarify an ambiguous verdict. In *Cook*, the jury's initial verdict form had a vote tabulation that indicated nine jurors had voted guilty, one juror had voted for attempt, and two for not guilty. *Id*. at 1260. The supreme court held that the trial court's subsequent poll of the jury yielded ambiguous results because it asked the jurors, "[i]s this your verdict?" instead of requiring them to state their individual vote or asking them if they had voted "guilty." *Id*. at 1260-61. Based on the tabulation on the original verdict sheet, the supreme court reversed the defendant's conviction as being one vote short of that required to return a guilty verdict. *Id*. at 1261.

16

Unlike *Cook*, the record in this case clearly shows the jury returned a unanimous guilty verdict. On the first page of the verdict form, the jury foreperson circled "GUILTY." On the second page, the foreperson signed and dated immediately below the statement, "We the jury find the defendant guilty of **Second Degree Murder** as charged. (Ten of you must agree)." Any ambiguity occurring in the polling of the jurors did not affect the jury's unanimous verdict.

Additionally, unlike the trial court in *Cook*, the district court in this case cured any possible ambiguity by clearly asking each juror whether he had voted for second degree murder and requiring him to individually answer "yes" or "no" when he was called by name.

Accordingly, this assignment of error is without merit.

### CONCLUSION

We affirm Defendant's conviction.

**AFFIRMED.**