HANS J. LILJEBERG, Judge.
On April 25, 2011, the Jefferson Parish District Attorney’s Office filed a bill of information charging defendant, Carlos Berroa-Reyes, and co-perpetrator, Jose Morales, with one count of armed robbery while armed with a shotgun in violation of LSA-R.S. 14:64 and 14:63.3.[1] Defendant pled not guilty at arraignment.[2] On June 30, 2011, defendant filed various pre-trial motions including motions to suppress evidence and statements. On August 31, 2011, the trial court heard and denied defendant s motions.
The matter was tried before a 12-person jury on November 7-9, 2011, and upon conclusion, defendant was found guilty as charged. Thereafter, the trial court sentenced defendant to 25 years at hard labor, to be served without benefit of probation, parole, or suspension of sentence. Defendant timely appealed. For the following reasons, we affirm.

FACTS

The victim, Rafael Abreu-Valerio, testified that he and the defendant “more or less” friends, having known each other for seven months prior to the robbery.[3] He further testified that on March 9, 2011, he was living at 1433 Utah Beach, in Bridge City, when he decided to play a practical joke on defendant and co-perpetrator, Jose Morales. Thus, the victim went over to the apartment defendant and Morales were seen visiting and pretended to be the police, which prompted the men to discard their drugs down the toilet. Defendant and Morales became upset, threatened to injure the victim, and demanded money for the drugs that had been destroyed. The victim paid the men and went back to his apartment, where he started drinking.
Angered by the events that had just transpired, the victim slashed the tires on a vehicle occupied by defendant and Morales. The men exited their vehicle, each carrying a gun and pointing it at him. The victim lifted his hands in the air, dropped the knife he had used to slash their tires *490 and pleaded with the men not to shoot him. The victim also gave the men $120.00 to pay for the damaged tire. The victim testified that when he tried to go back to his apartment, defendant put down the gun, picked up the knife, and followed him to his apartment with Morales close behind and still armed with a shotgun. The men then followed the victim into his apartment, where they locked the door, “turned up the music loud,” and told the victim to get them more money. The victim told them that he did not have any more money, so Morales proceeded to punch the victim in the face and then hit him with the shotgun. Once Morales stopped punching the victim, the defendant then took the victim’s cellular phone and some money out of the victim’s pockets. Unsatisfied with the amount of money recovered, the men continued to punch the Uvictim while demanding more money.[4] The victim further testified that the defendant came towards him with the knife as if he was going to stab him, but Morales intervened and was able to stop the defendant. After the men left his apartment, the victim used a neighbor’s phone to call his girlfriend, who then reported the incident to the police due to the victim’s inability to speak English.
The victim’s girlfriend, Liseyda Montoya, testified that she and the victim were living in an apartment at 1438 Utah Beach Drive at the time of the incident. Montoya testified that she is acquainted with the defendant and Morales (a.k.a. Larry). Montoya further testified that on March 10, 2011, she received a call from the victim to advise her of the incident involving the defendant and Morales. Because the victim does not speak English, Montoya called the police to report the incident. When Montoya arrived home from work, she observed that the victim had a black eye and had sustained injuries to his mouth and head. Montoya accompanied the victim to seek medical treatment the following day.
Co-perpetrator, Jose Morales, testified that he pled guilty to the armed robbery of Rafael Abreu-Valerio with a firearm.[5] Morales confirmed that the victim had “played a prank” on him and the defendant that resulted in the disposal of his marijuana. Morales testified that he confronted the victim, who paid him fifty dollars for the marijuana that was destroyed. Later that evening, Morales testified that he and the defendant were in the defendant’s car when they caught the victim slashing one of their tires.
Morales further testified that he had a shotgun in the trunk of the car that was later recovered by the police at his home, but maintained that defendant did not know about the shotgun. Morales also stated that the shotgun remained in the defendant’s car the entire time and was never brandished in the parking lot or brought into the victim’s apartment.
Morales explained that the victim offered the defendant 20 or 30 dollars to pay for the tire, but that the defendant told him it was not enough money to pay for a Cadillac tire. Morales further testified that he followed the victim and the defendant upstairs, where he observed the victim and defendant “having a little fight,” which he attempted to break up. According to Morales, the victim had a knife in his pocket, so Morales took the knife and “threw it out the door.” At that time, the *491 victim and defendant started fighting again, so Morales pushed the victim into the kitchen and left with the defendant.
Morales testified that they did not rob the victim, but that he decided to plead guilty to armed robbery because he was in possession of the victim’s cellular phone. Morales noted that the victim’s phone had fallen to the ground during the altercation with the defendant, and that he picked it up and put it in his car because he believed it was the defendant’s phone.
Morales’ trial testimony was in direct contradiction to a statement provided by Morales after the incident. Thus, Morales admitted that he had previously lied to the police when he was interviewed and told them that it was the defendant who had pulled the shotgun on the victim, and that he had taken the shotgun away from the defendant because he did not want to see the victim get shot. Morales also admitted that he lied to the police when he told them that the defendant had taken the victim’s knife and threatened to use it on the victim. Morales explained that he had lied to the police because at the time of his arrest he “wanted [the defendant] to look like the bad guy.” Morales further stated that he had originally told the police that the defendant and the victim had been arguing about money, but that his | statements to the police were falsehoods intended “to pin everything down on him [the defendant].”
Deputy Jesus Falcon, of the Jefferson Parish Sheriffs Office, testified that he arrested the defendant and assisted in the taking of defendant’s statement. Deputy Falcon testified that he advised defendant of his rights in Spanish from a Rights of Arrestee form written in Spanish.[6]
In his statement, defendant told the officers that the victim had slashed the tires to his friend’s car so they started arguing about how the victim was going to pay for the damage. Defendant denied ever seeing a shotgun that night, but admitted that he has used a shotgun before for hunting purposes. The defendant also told the police that because they were neighbors, he went with the victim to his apartment where the victim attempted to pay him $50.00 for the tire, which defendant refused because it would not cover the cost. Defendant stated that the victim came after him with a knife and they engaged in a physical altercation. According to defendant, Morales attempted to break apart the fight. Defendant denied that he or Morales brandished a gun during the dispute with the victim.
Detective Randy Thibodeaux, also of the Jefferson Parish Sheriff’s Office, testified that he investigated the armed robbery that took place at the victim’s apartment. When he arrived at the scene, he met with the victim, whom he observed to have sustained facial trauma. Upon entering the apartment, Detective Thibodeaux also observed blood behind the front door, in the kitchen, and in the living room, that Thibo-deaux believed to be consistent with the sequence of events described by the victim. Detective Thibodeaux testified that the victim identified photographs of Morales and the defendant as his assailants. Based upon the victim’s identification of the two suspects and statement provided to Thibodeaux, arrest warrants were obtained.
Jefferson Parish Sheriffs Office Detective David Kachtik testified that he prepared a search warrant for a black Cadillac believed to have been involved in the *492 incident. Upon execution of the warrant, Detective Kachtik recovered a Samsung cellular phone, a Samsung cellular phone battery, and a box of shotgun shells, among other items.[7] Using the phone number the victim had provided, Detective Kachtik was able to determine that the cellular phone found in the Cadillac belonged to the .victim. Detective Kachtik further testified that he executed a search warrant of the clothing worn by the defendant at the time of his arrest. Pursuant to that search, Detective Kachtik recovered $441.48. Detective Kachtik noted that during his brief interaction with the defendant, he asked him whether he had a shotgun, to which he responded “no.” However, when confronted with a photograph that had been obtained of the defendant holding a shotgun, the defendant said it was for hunting.[8]
Next, Detective Todd Rivere testified that on March 10, 2011, he participated in the execution of a search warrant at Morales’ residence in Bridge City. Several photographs depicting the evidence seized during the execution of the warrant were identified and admitted into evidence. Among the evidence seized from Morales’ home was a shotgun, marijuana, currency ($55.00), ammunition of various calibers, and a spent rifle cartridge.
The State rested and the defense called Cito Mercedes, the defendant’s uncle, to the stand.[9] Mercedes testified that on the day of the incident, he was outside of his apartment when he heard Morales complaining to the victim “that he needed to pay him fifty dollars.”[10] According to Mercedes, the -victim asked the defendant to convince Morales not to “charge [him] for the fifty dollars,” to which the defendant responded that he “was not going to get involved with that.” The victim then told the defendant that he did not “want to be his friend anymore.” Mercedes testified that after the defendant left, the victim told him he could “go after him [the defendant] and just follow him at point with a machete, to go on top of him with a machete, or, if not, cause him a big deal, a big problem that night, so he could really get mad, and they could go out at each other.”
Lastly, the defendant testified that in the hours leading up to the incident, he was in an apartment with Morales, who was preparing to smoke marijuana when someone kicked the front door and yelled “police.” Morales flushed the marijuana down the toilet, and the defendant exited the apartment through a window. Noticing no police cars, defendant went back to the apartment where he heard Morales and the victim, who appeared intoxicated, arguing about the incident. The defendant testified that Morales told the victim that he would have to pay him $50.00 or “they were going to have to fight, fight out, fight it, or something like that.” The defendant further testified that he was friends with both the victim and Morales *493 and did not want to get in the middle of their dispute.
Later that evening, while sitting in his car with Morales listening to music, the defendant testified that they caught the victim slashing one of his tires. When he confronted the victim about the damage he had caused, the victim offered him $30.00 or the loan of his vehicle. Defendant testified that they continued to argue and once in front of the victim’s apartment, he told the victim that if he did not pay for his tire he was going to call the police. According to defendant, the victim “got very mad and threw a punch” at him. The altercation escalated into the victim’s apartment where the defendant gave the victim “a couple of punches to his face.” Morales was able to break apart the fight after which they left the victim’s apartment.
Defendant denied robbing the victim, possessing a firearm, or threatening the victim with a knife that night. Additionally, on cross-examination, defendant testified that he had never seen Morales with a shotgun. Defendant stated that he never saw the shotgun that Morales confirmed was in the trunk of defendant’s vehicle. Lastly, defendant admitted that when he was arrested, he was in possession of $450.00.

ASSIGNMENTS OF ERROR

Defendant appeals his conviction, arguing that the trial court erroneously denied his motion to suppress evidence and allowed the State to present inadmissible other crimes evidence at trial.

DISCUSSION

In his first assignment of error, defendant argues that the State failed to prove a knowing and voluntary waiver, therefore, the trial judge erred in denying his motion to suppress statement. Specifically, defendant contends that the waiver falls short of the goal of reasonably conveying defendant’s Miranda rights.[11] Defendant asserts that he was questioned by Detective Falcon who although claiming to be fluent in Spanish, struggled with translating the language contained in the waiver of rights form. Thus, defendant maintains that Detective Falcon’s lack of fluency casts doubt on the validity of the waiver obtained in this case.
In response, the State argues that defendant is procedurally barred from raising, for the first time on appeal, the argument that defendant’s Miranda rights were not effectively communicated in Spanish by Detective Falcon. Alternatively, the State argues that it has met its burden of proving a knowing and voluntary waiver based on the totality of the circumstances in this case.

Motion to Suppress Hearing

At the motion to suppress hearing, Detective Jesus Falcon testified that he assisted in the taking of the defendant’s statement on March 10, 2011. Detective Falcon testified that because the defendant did not speak English, he assisted Detective David Deroche in translating the interview. Detective Falcon testified that he advised defendant of his rights in Spanish from a Spanish Rights of Arrestee form.
Detective Falcon was then asked to read the Rights of Arrestee form into the record, in Spanish, while the court’s interpreter, Emilio Rubi, translated Detective Falcon’s reading into English.
As translated into English by the Interpreter, Detective Falcon testified that the following rights were read to the defendant prior to conducting the interview:
Before asking you the following questions, you should understand your *494 rights. You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to speak to an attorney, to obtain counsel before we ask any question of you and have you with us while we are asking these questions. If you cannot hire an attorney, one will be assigned, one shall be appointed for you before questions, if you so wish. If you desire to answer the questions at this moment, without an attorney being present, you will have the right to not respond at any moment until you are able to speak to an attorney.
The defendant signed under the declaration that he had been read his rights by Detective Falcon. The last portion of the form entitled “Waiver of Rights” was then read by Falcon and translated by the Interpreter:
11 Waiver 0f Rights. I have understood what my rights are. I am willing to make questions of the waiver and of my answers. I do not wish to have an attorney at this moment. I understand and know what I am doing. No promises or threats have been made against me. No one has pressured me or coerced me against myself in any way.
The defendant also signed next to the Waiver of Rights. When asked by the trial court, through the use of the Interpreter, whether the defendant had understood everything Detective Falcon had just read in Spanish, the defendant answered in the affirmative.
In addition to signing the form twice, acknowledging that he understood his rights and elected to waive them, Detective Falcon testified that the defendant also initialed next to each of the rights he was read. Detective Falcon also testified that after inquiring into the defendant’s level of education, he read the Waiver of Rights form to the defendant “word of word” while the defendant read along. He also explained the waiver and his rights in layman’s terms. According to Falcon, the defendant indicated that he understood his rights and wished to waive them.
On cross-examination, Detective Falcon testified that prior to reading the defendant his rights, he also provided a copy of the Rights of Arrestee form to the defendant to read since the defendant had indicated that he was able to read. Defense counsel then asked Detective Falcon to read the Waiver of Rights portion of the form in Spanish for a second time because she believed the first translation was unclear. Specifically, the following colloquy took place between defense counsel and Detective Falcon:
Q: Okay. I only picked up on one particular question in this. “I am willing to make questions of my answers”?
A: I’m sorry?
Q: One of the rights or one of the statements beneath the signature is, as it was interpreted, “I am willing to make questions of my answers” or did I miss that?
|12A: I don’t see that, ma’am.
Q: That would be under the rights.
THE STATE: Or the waiver?
Q: Yeah, on the waiver.
A: I don’t see that.
Q: I definitely heard that in the interpretation. That’s why I asked.
THE COURT: Do you want him to reinterpret those rights again?
* * *
THE COURT: What part of the form, Ms. Parent, are you directing the witness? Direct the witness to that section of the form that you have a question.
*495 Q: Waiver of rights at the bottom of the page.
THE COURT: All right. Would you reinterpret and, this time, as he speaks in Spanish — you can stay right there — translate it for us.
(THROUGH THE INTERPRETER):
I know what my rights are. I am willing to make questions of this declaration and of the answers. I do not wish to have an attorney at this moment. I know and I understand what I am doing. No questions or threats have been made, and no one has pressured me or has coerced me of the questions — of the matters that have been used against me.
Q: So, in there there is a statement that says — and I’m presuming it’s being interpreted — One, I am willing to make a statement and answer questions. It’s interpreted I’m willing to make questions. Is that right?
INTERPRETER: I did not say that to him.
At the conclusion of the hearing, when asked by the trial court whether the defense had any argument it wished to present to the court prior to ruling, defense counsel presented no argument concerning the validity of the waiver based on Detective Falcon’s alleged inability to effectively communicate defendant’s rights.
The trial court denied defendant’s motions to suppress statements, evidence and identification, and noted defense counsel’s general objection. In determining whether the trial court’s ruling on a defendant’s motion to suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing, but may also consider the evidence presented at trial. State v. Huntley, 08-125, p. 6 (La.App. 5 Cir. 5/27/08), 986 So.2d 792, 796 (citing State v. Brumfield, 96-2667, p. 43 (La.10/20/98), 737 So.2d 660, 683, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999)).
At trial, Detective Falcon testified that he was born in the United States but that Spanish was his first language. Again, Detective Falcon testified that he advised defendant of his rights in Spanish from a Rights of Arrestee form written in Spanish.[12] Detective Falcon then translated the form for the jury as follows:
A: Before answering — before we ask you any questions, you have the right to remain silent.
Q: Okay. And then the next one, if you could just translate it into English?
A: Read it in Spanish, sir?
Q: No. Translate it to English.
A: Anything you say can be used against you in court.
Q: Okay. And the next one?
A: You have the right to speak to an attorney before questioning and have him with you during questioning.
Q: Okay. This line?
A: If you cannot obtain an attorney, one will be provided to you if you wish.
Q: And the last one?
A: If you wish to answer any questions at this time without an attorney present, you still have the right to — you can answer if you wish and stop at anytime, also, if you wish, until you can get with your attorney.
Q: All right. And here it says — can you translate that line?
A: I have read my declaration of my rights.
Q: Okay. And he signed that there?
*496 A: Yes, sir.
Detective Falcon also indicated that the defendant signed the form a second time waiving the rights that he had previously been advised. Additionally, the transcribed audio statement form indicates that before taking defendant’s official statement, Detective Falcon read defendant his rights for a second time. A recording of defendant’s statement taken in Spanish was then played for the jury as they followed along from the transcription. The defense did not lodge an objection as to the admissibility of the statement.
For the first time on appeal, defendant now argues that the State failed to prove a knowing and intelligent waiver because the waiver as translated in court demonstrates Detective Falcon’s inability to effectively communicate the Miranda rights to defendant in Spanish. Specifically, defendant contends that the waiver was deficient as translated because it states “I am willing to make questions of this declaration and of the answers.” Defendant claims that this advisory offers compelling evidence that the remainder of the waiver is likewise constitutionally deficient.
Although the trial court conducted a suppression hearing before trial, defense counsel failed to object, or argue that the State failed to carry its burden of proving a knowing waiver. Accordingly, the trial judge never ruled on the issue of whether a knowing and intelligent waiver was obtained in this case due to Detective Falcon’s alleged lack of Spanish fluency. Further, defendant’s written motion to suppress does not assert the grounds for suppression now argued on appeal.[13]
Articulating a new basis for the motion to suppress for the first time on appeal is prohibited under LSA-C.Cr.P. art. 841, since the trial court would not be afforded an opportunity to consider the merits of the particular claim. State v. Harris, 414 So.2d 325 (La.1982). Louisiana courts have long held a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress. State v. Montejo, 06-1807, p. 22 (La.5/11/10), 40 So.3d 952, 967, cert. denied, Montejo v. Louisiana, — U.S. -, 131 S.Ct. 656, 178 L.Ed.2d 513 (2010); See: LSA-C.Cr.P. art. 841(A) (“An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.”); State v. Simmons, 422 So.2d 138 (La.1982); State v. Harris, 414 So.2d 325 (La.1982); State v. Davis, 357 So.2d 1125 (La.1978); See also: State v. Carter, 10-973, p. 7-8 (La.App. 5 Cir. 8/30/11), 75 So.3d 1, writ denied, 2011-2060 (La.2/10/12), 80 So.3d 469 (holding defendant waived the argument that evidence should be suppressed because the search exceeded the scope of the search warrant when the defense counsel never asked the trial judge to rule on the “constitutionally overbroad” issue asserted for the first time on appeal); State v. Brown, 434 So.2d 399 (La.1983) (rejecting defendant’s alternative argument regarding the denial of his motion to suppress because he had not raised the issue at trial); State v. Johnson, 07-1040, p. 8 (La.App. 4 Cir. 9/10/08), 993 So.2d 326, 330-31, writ denied, 2008-2649 (La.6/5/09), 9 So.3d 868 (“failure to raise a ground for suppressing an item of evidence in a properly filed motion to suppress waives such *497 a basis for exclusion on appeal”); State v. Jackson, 04-1388, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 911, writ denied, 05-1740 (La.2/10/06), 924 So.2d 162 (defendant is limited on appeal to the grounds he articulated at trial and a new basis for a claim, even if it would be meritorious, cannot be raised for the first time on appeal).
Accordingly, we find that defendant has waived the argument that his statement should be suppressed because his waiver was invalid when Detective Falcon failed to adequately advise him of his Miranda rights in Spanish. Therefore, this assignment of error will not be addressed on appeal.
In his second assignment of error, defendant argues that it was error for the trial court to invite the State to present inadmissible evidence of other crimes. Specifically, defendant contends that the trial court erred in finding that defense witness, Cito Mercedes, “opened the door” for the introduction of other crimes evidence; namely, the introduction of defendant’s pending aggravated battery charge in Orleans Parish and an incident involving a battery committed with a rifle in Bridge City on January 20, 2011. Defendant further maintains that the objectionable testimony was intentionally elicited by the State and thus, attributable to the State. Accordingly, defendant maintains that a mistrial was an appropriate remedy. And although defendant concedes that defense counsel failed to move for a mistrial, defendant submits that the failure to object should be “excused given the trial court’s role in inviting the improper impeachment on cross.”
At trial, the defense called Cito Mercedes, defendant’s uncle, in its case-in-chief. On cross-examination, Mercedes was asked: “[y]ou love your nephew?” to which Mercedes responded “[y]es.” The State then followed-up Mercedes’ response with “[y]ou love him no matter what, right?” to which Mercedes responded “[n]o. If he would do bad things, no. I came here because he’s a good nephew, he’s hard working.” (Emphasis added).
A bench conference was held at which time the State argued that Mercedes’ testimony opened the door to the introduction of other crimes evidence. Thus, the State requested the court’s permission to question Mercedes about two incidents involving the defendant, namely defendant’s pending aggravated battery charge in Orleans Parish and an incident involving a battery committed with a rifle in Bridge City on January 20, 2011. The trial court agreed with the State, noting that through his response, Mercedes “opened the door. He’s basically said, from a character standpoint, he’s a good boy.” It appears that the defense attorney also agreed with the State and the trial court, stating:
DEFENSE: Well, he can ask him if he knows.
* * *
DEFENSE: I do understand that, because he says he’s a good boy that he can ask him do you know. I understand about that. But the remark is prejudicial in the fact that this child has not been arrested for that. I was going to bring it out on direct when I talked to Carlos.
THE COURT: You’re going to cover it anyway. So you’re going to call him?
DEFENSE: Okay. Yes.
With the agreement of the court and defense counsel, the State proceeded to question Mercedes regarding his knowledge of an aggravated battery incident involving defendant at the House of Blues in New *498 Orleans. Mercedes testified that he was unaware of the aggravated battery incident. The State then asked Mercedes whether he knew a man by the name of Santos Cardenas. Defense counsel objected to this line of questioning on the grounds that the State was attempting to introduce evidence of a crime that was not a conviction and because it was “just prejudicial.” A bench conference was held where the State explained that it was not questioning Mercedes any further about the details surrounding the aggravated battery crime of which the witness had no knowledge, but rather, was inquiring into his knowledge concerning a second battery incident involving the hitting of a man with a rifle in Bridge City. Defense counsel responded “[o]h, you didn’t tell me about that either.” Without objection, the State then questioned Mercedes about the second offense. Defense counsel then concluded re-direct examination by asking Mercedes whether he knew defendant to be a violent person, to which Mercedes responded “[n]o, I don’t know him as a violent person, because I been knowing him since he was little.”

Procedural Issue

For several reasons, we find that defendant has failed to preserve this issue for appeal.
First, the defendant failed to properly preserve this issue for appeal, when defense counsel failed to lodge a proper objection. In order to preserve the right to seek appellate review of an alleged trial court error, the party alleging the error must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. LSA-C.Cr.P. art. 841; State v. Taylor, 04-200, p. 9 (La.App. 5 Cir. 10/26/04), 888 So.2d 272, 279, writ denied, 04-3162 (La.4/1/05), 897 So.2d 601. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. LSA-C.Cr.P. art. 841; State v. Rochon, 98-717, p. 4 (La.App. 5 Cir. 3/10/99), 733 So.2d 624, 627. A defendant is precluded from raising an error related to the State’s elicitation of other crimes evidence on appeal when the defendant failed to lodge a contemporaneous objection on this ground during trial as required by LSA-C.Cr.P. art. 841. State v. Noil, 01-521, p. 25 (La.App. 5 Cir. 12/26/01), 807 So.2d 295, 313, writ denied, 02-0276 (La.10/25/02), 827 So.2d 1177.
As to the first offense, the aggravated battery committed in Orleans Parish, we find that defense counsel failed to make a timely objection, and even conceded that because Mercedes said the defendant was “a good boy,” the State could ask Mercedes “if he knows” about the battery, thereby acquiescing to the State’s line of questioning.[14] And although defense counsel objected when the State began questioning Mercedes about the second offense, the objection was not concerning the first offense, and had come after the question and response pertaining to the first offense had been heard by the jury. An objection made after the evidence is before the jury is too late. State v. Rivet, 01-353 (La.App. 5 Cir. 9/25/01), 798 So.2d 219, 227; State v. Bretz, 394 So.2d 245, 251 (La.1981), cert. denied, 454 U.S. 820, 102 S.Ct. 102, *499 70 L.Ed.2d 91 (1981); State v. Jones, 99-1185, p. 20 (La.App. 5 Cir. 9/22/00), 769 So.2d 708, 719. Moreover, the record indicates that the trial court never ruled on defendant’s late objection that the evidence was “just prejudicial.”
Additionally, as to the second offense, the defendant waived his right to assert that the introduction of the second offense was error when defense counsel failed to lodge a contemporaneous objection to its introduction. Specifically, when the State informed defense counsel of its intent to question Mercedes about the alleged battery committed by defendant with a rifle in Bridge City, defense counsel’s only response was “[o]h, you didn’t tell me about that, either”, again acquiescing to the State’s line of questioning. Thus, due to defense counsel’s failure to object to the introduction of these two offenses, we find that these issues are not preserved for consideration.
Second, had we found that defense counsel lodged a proper objection to the introduction of other crimes evidence, any such objection was based on the grounds that the aggravated battery did not result in a conviction and that it was “just prejudicial.” However, for the first time on appeal, defendant now asserts a new basis for objection to the introduction of the other crimes evidence. In particular, on appeal defendant now argues that Mercedes’ testimony did not open the door to the introduction of inadmissible other crimes evidence and that the trial court erred by “unfairly interjecting itself into the proceeding” by inviting the State to construe “good nephew” to mean “good boy” and thus, allowing the presentation of inadmissible other crimes evidence.
Again, a new basis for objection cannot be raised for the first time on appeal. See: LSA-C.Cr.P. art. 841; State v. Necaise, 466 So.2d 660, 667 (La.App. 5 Cir.1985) (where this Court found that a new basis for objection cannot be raised for the first time on appeal); State v. Hill, 636 So.2d 999, 1002 (La.App. 5 Cir.1994), writ denied, 94-3144 (La.9/1/95), 658 So.2d 1259, (citing State v. Henry, 449 So.2d 486 (La.1984), where the court found that counsel’s failure to state the ground of his objection with specificity prevented him from raising the issue on appeal). Thus, because defendant now asserts a new ground for his objection that was never presented to the trial court, we also find that defendant is prevented from raising this issue on appeal.
Third, defendant failed to request a mistrial or admonition to the jury after the State began questioning Mercedes about the prior bad acts. The appropriate remedies for the improper admission of other crimes evidence are found in LSA-C.Cr.P. art. 770. State v. Sterling, 95-673, p. 14 (La.App. 5 Cir. 2/27/96), 670 So.2d 1316, 1324. LSA-C.Cr.P. art. 770 provides that “[u]pon motion of a defendant, a mistrial shall be ordered when a remark, made within the hearing of the jury by ... [the] district attorney ... during the trial ... refers directly ... [to another] crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.” LSA-C.Cr.P. art. 770(2) (Emphasis added). The failure of the defense to move for a mistrial on the wrongful admission of other crimes evidence is a waiver of the error. Sterling, 95-673 at 15, 670 So.2d at 1324; Official Revision Comment (b) to LSA-C.Cr.P. art. 770.
Accordingly, in failing to avail himself of the procedural remedies provided under LSA-C.Cr.P. art. 770, we additionally find that defendant waived the alleged error and thus, is procedurally barred from raising this issue on appeal. See Noil, supra; Sterling, supra, noting that although de *500 fense counsel lodged an objection to the state’s improper introduction of other crimes evidence, he did not request a mistrial or an admonition to the jury.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920. State v. Oliveaux, 312 So.2d 337 (La.1975). The following matters require corrective action.
First, we note that the trial judge imposed an indeterminate sentence because he failed to impose the mandatory five-year firearm enhancement provision required by La. R.S. 14:64.3. Louisiana Revised Statute 14:64.3 provides:
When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.
Although the State listed the enhancement in the bill of information and the jury found defendant guilty of committing armed robbery with a firearm, the trial judge did not specify what portion, if any, of defendant’s 25-year sentence included the firearm enhancement penalty under LSA-R.S. 14:64.3.
We therefore find the sentence indeterminate. We vacate that sentence and remand for resentencing. See State v. White, 42,725, pp. 12-13 (La.App. 2 Cir. 10/24/07), 968 So.2d 901, 908-09 (where the defendant was convicted of 2 counts of armed robbery with a firearm, and sentenced to 35 years at hard labor without benefit of parole, probation, or suspension of sentence on each count to run concurrently. On error patent review, the court noted that the trial court did not specify what portion, if any, of the defendant’s 35-year hard labor sentence without benefits was imposed under LSA-R.S. 14:64.3. The court found that the absence of a specification that the defendant’s sentences included a term under LSA-R.S. 14:64.3, rendered the defendant’s sentence indeterminate. Therefore, the court vacated the sentences and remanded for resen-tencing according to law for clarification of whether the defendant’s sentences included any additional punishment under LSA-R.S. 14:64.3.)
Second, the transcript indicates that the trial court provided defendant with an incomplete advisal of the time period for seeking post-conviction relief as required by LSA-C.Cr.P. art. 930.8. Specifically, the trial court advised defendant that he had “two years to seek post-conviction relief.” It is well-settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to LSA-C.Cr.P. art. 930.8, the court may correct said error by informing the defendant of the applicable prescriptive period for post-conviction relief. See State v. Smith, 12-580 (La.App. 5 Cir. 12/27/12), 106 So.3d 1265; State v. Roche, 05-237 (La.App. 5 Cir. 4/25/06), 928 So.2d 761, 767, 768, writ denied, 06-1566 (La.1/8/07), 948 So.2d 120; State v. Thomas, 10-220 (La.App. 5 Cir. 11/9/10), 54 So.3d 678, writs denied, 10-2758 (La.4/25/11); 62 So.3d 89 and 10-2752 (La.5/20/11), 6 So.3d 974; State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, writ denied, 11-1753, (La.2/10/12), 80 So.3d 468; State v. Neely, 08-707 (La.App. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied, 09-0248 (La.10/30/09), 21 So.3d 272; State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied, 09-0158 (La.10/16/09), 19 So.3d 473.
Thus, by means of this opinion, we correct this error and inform defendant that *501 no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of LSA-C.Cr.P. art. 914 or 922.

DECREE

Based on the foregoing, we affirm defendant’s conviction, vacate defendant’s sentence as indeterminate, and remand for re-sentencing.

CONVICTION AFFIRMED; SENTENCE VACATED & REMANDED

. On November 7, 2011, the State amended the bill of information to include defendant’s and co-perpetrator's aliases, and to clarify that defendant was being charged under the armed robbery with a firearm statute pursuant to LSA-R.S. 14:64.3.

. Morales pled guilty after jury selection.

. The victim also testified that he was well acquainted with Jose Morales, defendant’s co-perpetrator, having known him for approximately three years.

. The victim testified that approximately $400.00 was taken from his pocket, and that approximately $3,000.00 was taken from one of his dresser drawers.

. Morales further testified he has been convicted of various crimes on five separate occasions.

. The Rights of Arrestee form written in Spanish was admitted into evidence. A recording of defendant’s statement taken in Spanish was played for the jury as they followed along from a transcript translated into English.

. Detective Kachtik also identified a tire that was located in the trunk of the Cadillac that appeared to be punctured.

. On cross-examination, Detective Kachtik testified that when he had the conversation about the shotgun with the defendant, an interpreter was not present because the defendant indicated that "he spoke a little English, and ... appeared that he understood everything” that was asked.

. Mercedes testified that the defendant used to live with him.

. Griselda Geraldino also testified for the defense. Geraldino testified that she is acquainted with the defendant, and that on the date of the incident she overheard an argument about money. Geraldino further testified that the victim "drank a lot,” and that the defendant "is a good boy.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The Rights of Arrestee form written in Spanish was admitted into evidence as State’s Exhibit 32. Notably, the form indicated that defendant had a twelfth grade education.

. Defendant’s motion to suppress requests that the court suppress defendant's statement on two grounds: (1) the statement was obtained through the use of influence of fear, duress, intimidation, threats, inducements, and promises; and (2) the defendant did not intelligently waive the right to incriminate himself because he was not advised of his Miranda warnings until after he was presented a rights of arrestee form, which was after he made his statements.

. See State v. Thompson, 12-409 (La.App. 5 Cir. 12/11/12), 106 So.3d 1102, where this Court noted that where defense counsel acquiesces when the court sustains a State's objection to the examination of a witness, that objection is waived.