STATE OF LOUISIANA

VERSUS

ALEXSY MEJIA

NO. 23-KA-161

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 21-5800, DIVISION "E"
HONORABLE FRANK A. BRINDISI, JUDGE PRESIDING

November 29, 2023

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
John J. Molaison, Jr., and Scott U. Schlegel

**CONVICTIONS AFFIRMED;**
**SENTENCES AMENDED AND CORRECTED,**
**MATTER REMANDED, PER INSTRUCTIONS**
    **SMC**
    **JJM**
    **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Juliet L. Clark
     Thomas J. Butler

COUNSEL FOR DEFENDANT/APPELLANT,
ALEXSY MEJIA
     Roger W. Jordan, Jr.

**CHEHARDY, C.J.**

Defendant, Alexsy Mejia, appeals his convictions and sentences for aggravated kidnapping and aggravated burglary. Defendant was 16 years old at the time of the incident. Defendant argues on appeal that the State failed to present sufficient evidence to support the aggravated kidnapping charge; that his constitutional rights were violated when one of the victims failed to testify at trial; that the trial court erred in failing to suppress both his statement and the victims' "show up" identification of him; and that his sentences are excessive and fail to conform to the statutory mandates for the sentencing of a juvenile.

For the reasons that follow, defendant's convictions are affirmed. The sentence imposed on the two counts of aggravated kidnapping are amended to acknowledge that defendant will be eligible for parole consideration pursuant to the criteria set forth in La. R.S. 15:574.4(D). The sentence imposed for count three, on the charge of aggravated burglary, is corrected to remove the restriction on benefits. Pursuant to La. C.Cr.P. art. 930.8, defendant is notified that no application for post-conviction relief shall be considered if filed more than two years after the judgment of conviction and sentence has become final.

## STATEMENT OF THE CASE

On October 21, 2021, a Jefferson Parish Grand Jury indicted defendant with the aggravated kidnapping of Mohan Kokatnur (D.O.B. 3/19/30) in violation of La. R.S. 14:44 (count one), the aggravated kidnapping of Saroj Kokatnur (D.O.B. 1/14/40) in violation of La. R.S. 14:44 (count two), and the aggravated burglary of 4916 Elmwood Parkway in Metairie, which belongs to Mohan and Saroj Kokatnur, in violation of La. R.S. 14:60 (count three). Defendant was arraigned and pled not guilty on October 29, 2021.

After an August 25, 2022 hearing on defense counsel's oral motion to suppress statement and identification, the trial court denied the motion. Defendant

filed a writ application, which this Court denied. *State v. Mejia*, 22-K-461 (La. App. 5 Cir. 10/19/22) (unpublished writ disposition).

On October 25, 2022, trial commenced before a twelve-person jury, and on October 26, 2022, the jury unanimously found defendant guilty as charged on all counts. On November 9, 2022, after victim impact statements were presented, the trial court sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence as to counts one and two, the aggravated kidnapping charges, and to 30 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on count three, the aggravated burglary charge, with the sentences on each count to run concurrently.

On November 22, 2022, defendant filed a Motion for Appeal, which the trial court granted on November 30, 2022. On December 2, 2022, defendant filed a Motion to Reconsider Sentence and a Motion for Appeal and Designation of Record.[1] On December 12, 2022, the trial court denied the motion to reconsider sentence and, later that day, granted the motion to appeal.

## FACTS

On July 9, 2021, armed with a gun and wearing a mask, defendant entered the home of Mohan and Saroj Kokatnur through a window and demanded money from them. Defendant had performed work for the Kokatnurs, who are elderly, in the past at their home. When the victims told defendant that they did not have the money, defendant rode with them in their car to Chase Bank while holding Dr. Kokatnur at gunpoint. The victims entered the bank together while defendant

---

[1] Although the trial court granted the first motion for appeal before ruling on the motion to reconsider sentence, no error occurred. The trial court retains jurisdiction to rule on a motion to reconsider sentence, and a defendant is within his rights to request reconsideration of his sentence even after an order of appeal is entered. *State v. Lewis*, 51,735 (La. App. 2 Cir. 1/31/18), 245 So.3d 36 (citing *State v. Larkins*, 51,540 (La. App. 2 Cir. 09/27/17), 243 So.3d 1220, *writ denied*, 17-1900 (La. 9/28/18), 253 So.3d 154). *See also* La. C.Cr.P. arts. 881.1(C) and 916(3).

remained in the car. The victims immediately alerted a bank employee, who called the police. When the police arrived, defendant fled the scene on foot. Officers soon thereafter found defendant hiding inside a trashcan, and he was apprehended. Approximately 30 minutes later, the victims were taken to the location where defendant had been apprehended. Defendant was removed from the back of a police car, and the victims positively identified defendant as someone they knew and as the person who held them at gunpoint. Jefferson Parish Sheriff's deputies arrested defendant and contacted defendant's mother. After his mother was present, an interpreter was called in to assist in reading defendant's *Miranda* rights with his mother and the defendant. Defendant waived his rights and then gave a statement to Detective Carollo, confessing to the events of that afternoon.

At trial, the jury heard testimony from one of the victims, the bank branch manager, and several detectives who had either responded to the bank's 9-1-1 call or had been involved in the investigation. Adam Kraus, a branch manager at the Chase Bank in Kenner, testified that he knew the Kokatnurs as bank customers, and that on July 9, 2021, when they entered the bank, their demeanor was different and Mrs. Kokatnur was crying hysterically. She said, "They're taking fifty thousand dollars, they want fifty thousand dollars." Dr. Kokatnur told Mr. Kraus that someone put a gun to his head, made him come to the bank, and wanted $50,000. After he saw a person inside of the Kokatnur's vehicle through the window, Mr. Kraus called 9-1-1 and informed the operator about an armed man in the parking lot.

Officer Leia Vega[2] with the Kenner Police Department responded to the call at the Chase Bank on Williams Boulevard that day. She testified that while she was en route, the dispatcher advised her that the suspect was armed and still inside of

---

[2] Witnesses Leia Vega and Michael Vega are married; both work for the Kenner Police Department.

an "older model blue Toyota." Officer Vega located the vehicle when she arrived at the scene, parked her police unit, and waited for other deputies to arrive to assist her. Surveillance video taken at the time, which was played for the jury, showed the suspect exiting the vehicle and running from the scene. Officer Vega testified that the suspect was wearing a black hoodie with the hood on his head. Officer Vega and another officer pursued the subject in their police units but lost sight of him at a shopping center. She testified that other officers had a visual on the suspect, but she did not. She explained that she did not see him again until he was viewed crouching in the bushes behind a Wendy's next to the shopping complex. In her report, she indicated that the female victim said that she could not identify the suspect because he had a mask on; she could only describe his clothing and stature. She confirmed that the person she saw getting out of the car at the bank is the same person who was arrested by her fellow officers.

Officer Michael Vega with the traffic division of the Kenner Police Department was also dispatched to the bank. Before he arrived, other officers advised him that the suspect exited the vehicle and ran, and that they lost sight of him running northbound near a Baskin Robbins. Officer Vega exited his vehicle and walked toward the back of a nearby Wendy's and observed the suspect, who wore a black hooded sweatshirt, jump out of the bushes and run across the parking lot of Allstar Lanes. Officer M. Vega testified that the surveillance video at Allstar Lanes showed him running after the subject through the parking lot, and the suspect was later identified as defendant. Officer Vega chased defendant along the north side of the bowling alley and into the backyard of a complex, where the officer knocked down some trashcans. He exited onto Martinique Boulevard at the same time that another officer stopped at the corner of Martinique and told him that defendant did not exit onto the street. Officer M. Vega then discovered

defendant, who was wearing the same clothing as the person being chased, inside one of the trashcans, because defendant's feet were hanging out.

Officer M. Vega identified a black hooded sweatshirt, light gray pants, and an orange mask as the clothing worn by defendant. He also identified a cell phone that had been found next to the suspect when he was pulled out of the trashcan. He asked the suspect where the gun was, and defendant informed him that the gun was still inside the vehicle. Officer M. Vega stated that the gun was found in the victims' vehicle along with one glove. The matching glove was found where defendant had been hiding in the bushes. He testified that defendant's shoes were also found in the bushes and that defendant had run barefoot. Officer M. Vega confirmed that he was on the scene when the victims identified defendant as the person who forced them to enter the bank.

Mrs. Kokatnur testified that she and her husband have been married for fifty-nine years; her husband was ninety years old and she was eighty-two years old at the time of the incident. She and her husband met defendant through their gardener, who brought him to their house to assist with work. She stated that she and her husband liked defendant. They occasionally allowed him to complete tasks inside their home and he sometimes ate a meal with them. On July 9, 2021, while she was in the master bathroom, Mrs. Kokatnur heard "somebody with the black thing" but she could not see his face, only his eyes, and that he had a gun. She stated: "Then I could see his eyes were a little turned down, Alexy's, and his gun was down. Then I could see I know this person through his eyes. I felt it strong. I could see him." She stated that she could see "familiarness in him." She explained that her husband thought "it was him" and that he recognized defendant more than she did. When asked if defendant pointed the gun at her, she answered, "[j]ust gun was there. No, he didn't point, he wanted to kill him maybe."

Mrs. Kokatnur testified that defendant instructed her to come out and told her that he wanted $50,000 in cash. Mrs. Kokatnur stated that her husband was doing laundry, and defendant said, "[w]here is your husband," and "I want to kill him." She testified that she called her husband in their native language to tell him to come out and that someone had a gun.[3] When Dr. Kokatnur entered, defendant stated, "I want fifty thousand dollars." Mrs. Kokatnur explained that she lied and told defendant that she could not go to the bank alone because she was unable to write well in English, believing that this was the only way to save her husband.[4]

Afterward, Mrs. Kokatnur went to her vehicle, followed by her husband who walked slowly due to arthritis. Defendant pushed her husband and told him to move faster. As she drove to Chase Bank, her husband was in the front passenger seat, and defendant sat behind him in the back seat while he held a gun to her husband's head and cursed at her. When they arrived, defendant wanted Mrs. Kokatnur to enter the bank alone, but she told him that her husband had to accompany her because he was the main person on the account. She testified that at this time, defendant did not threaten them and the gun was on the seat. When they entered the bank, the Kokatnurs told Mr. Kraus what was happening, and he called the police.

Mrs. Kokatnur further testified that a female police officer informed her that the suspect hid in a garbage can. A few minutes later, as they sat in the back seat of a police vehicle, the Kokatnurs were asked to make an identification. Mrs. Kokatnur confirmed that the police showed her the person who held her and her husband at gunpoint. She stated, "I could see his figure and all. Like we could

_____

[3] Mrs. Kokatnur explained that they are from south of Bombay and speak "Marathi."
[4] When asked if defendant forced them into the vehicle, Mrs. Kokatnur explained:
No, no. What happened, then I said we had to go to the bank because—if he want. He was ready to go to bank. But I think, if that would happen any really bad person, he would have killed us right there, and money, you know. But he said, Take to the bank, you know. I said, [w]e have to go to the bank. And then we'll take out. Because I told him I cannot write that much English to spell. I had to lie for my husband's life. I lied. First time.

recognize." She recalled that an officer held onto him, but she could not see if he was in handcuffs. She confirmed that the police told her that this was the person who had been in their house.

After the trial court allowed the State to ask defendant to put on the mask that previously had been admitted into evidence, Mrs. Kokatnur positively identified defendant as the individual who was in her house that day. She confirmed that defendant was the same person she was shown while they were in the back of the police unit. She denied that she or her husband called the police and told them that they had concerns about defendant being the perpetrator. She also denied telling officers that the perpetrator had a Hispanic accent or that he was wearing jeans.

After determining that the incident had begun in an unincorporated portion of Jefferson Parish, the Kenner Police Department contacted the Jefferson Parish Sheriff's Office (JPSO) for purposes of taking over the investigation. Detective Justin Jerry with the JPSO robbery section explained that certain items were collected from the scene at Chase Bank, including a black glove and a loaded .38 special revolver containing six bullets found inside the victims' vehicle. A pair of Nike shoes and a matching glove were located in the bushes behind Wendy's. Photographs of all of these items were admitted into evidence. Detective Jerry testified that surveillance video taken near defendant's residence showed defendant leaving his home wearing the same shoes; he further explained that when defendant was found, he was not wearing shoes. Detective Jerry subsequently went to the victims' residence, determining that defendant entered through an unlocked bathroom window. He stated that the victims did not tell him that they knew the suspect, who was covered from "head to toe," but they told him that the perpetrator had a Hispanic accent. The victims said that defendant asked for various amounts of money, ranging from $10,000 to $100,000.

Detective Eric Hymel with the JPSO robbery section testified that he was the lead investigator in this case. He explained that defendant was arrested at the scene and was brought in for questioning. The JPSO recovered multiple surveillance videos that assisted in the investigation.[5] Detective Hymel stated that he reviewed a report created by the digital forensic unit for a cell phone registered to "Alexy Mejia," which report had been produced pursuant to a search warrant. GPS locations from the phone showed that the cell phone traveled along an area that overlapped with the location of Chase Bank, noting that one of the "dots" overlapped on Martinique Boulevard, where defendant was apprehended while hiding in the trashcan.

Detective Hymel stated that he learned that a friend of both the victims and defendant contacted the Kokatnurs to coordinate a meeting with defendant's mother and brother, so that they could ask the Kokatnurs for forgiveness and to ask the district attorney's office to drop the charges against defendant. Afterward, Mrs. Kokatnur expressed her concerns to Detective Hymel about properly identifying defendant, and, in light of her relationship with defendant, she had a hard time comprehending that he would do this. Detective Hymel testified that Ms. Kokatnur was "second guessing" herself. He reminded her of the information that she already had provided and told her not to let anyone taint her original account of the incident.[6]

James Carollo, formerly with the JPSO, conducted an interview of defendant that was audio and video recorded. Portions of the interview were played for the

---

[5] The detective explained that the surveillance videos were recovered from Chase Bank, a nearby building, and defendant's apartment complex. Except for the video from the apartment complex, he agreed that the videos did not show defendant's face. He believed that defendant wore shorts and a t-shirt and was carrying a backpack and a garbage bag when defendant left his apartment. He denied that defendant wore a mask, jeans, sweatpants, or a black hooded sweatshirt.

[6] Detective Jerry corroborated that he was aware of at least one call by the victims in which they expressed concern about defendant being the aggressor. He testified that they were informed that defendant's associates were contacting the victims and asking them not to pursue the case.

jury. He testified that before taking defendant's statement, he went through the Juvenile Rights form with both defendant and his mother, obtaining assistance from another JPSO officer, Detective Jesus Falcon, who served as an interpreter. He said that the form was written in Spanish and English, and defendant was advised of his rights in the presence of his mother. He indicated that defendant's mother was not in the room for the entirety of the interview because defendant did not want her present.

JPSO Detective Jesus Falcon testified that his first language is Spanish, his second language is English, and he often translates for other parties who speak only Spanish. He confirmed that he assisted in advising defendant and his mother of defendant's rights, and stated that the entire conversation with defendant and his mother was captured on video, which was played for the jury while he translated. He read the form to defendant and his mother in Spanish and filled out the form as they read along. Detective Falcon stated that defendant could speak English. He indicated that defendant signed the form and waived his rights, and that Detective Falcon and defendant's mother then left the room.

In defendant's statement given to Detective Charles Carollo after Detective Falcon and defendant's mother left the room, Detective Carollo asked defendant if he knew the victims. Defendant stated in English that he knew them because he worked for them until about a month before the incident. Defendant further indicated to Detective Carollo that on the day of the incident, defendant's friend gave him a ride to the victims' residence. After entering the backyard, defendant entered their home through an unlocked bathroom window. Once inside, he told the woman to give him money and pointed a gun at her. He had purchased the gun, a black revolver, off the street in New Orleans for $300. Defendant motioned for her to exit the room and he followed her, and she called out to her husband, whom defendant had seen in the laundry room. Defendant stated that he told them to get

$20,000; she informed him that she did not have any cash and would need to go to the bank. After they denied having that amount, defendant agreed to $10,000.

Defendant stated that he told them to get in the vehicle, where the woman was in the driver seat, her husband was in the passenger seat, and defendant was in the back seat. He placed the gun on the center console of the vehicle and instructed them not to ask questions and to drive. When they arrived at Chase Bank, defendant told her to go inside alone, but she told him that she could not, and defendant said "okay." About ten minutes later, defendant saw a police car arrive, so he exited the vehicle and started to run. He explained that he was not thinking and did not take the gun with him. He told the detective that he tried to take his mask off, but it was stuck, so he could not see. After he got the mask off, defendant had difficulty running because his shoes kept coming off. He ran around Chase Bank and through a shopping center parking lot before jumping inside a bush. He placed his shoes there and threw his broken glasses on the ground. After a police vehicle arrived, an officer exited the vehicle and turned near the bushes. Defendant jumped out of the bushes and ran away, and when he turned around, he observed the officer chasing him. He jumped inside a dumpster headfirst, but it fell over, which was how the officer knew he was inside. While in the dumpster, he took his phone out.

Defendant confirmed that he initially wore shorts and a jersey, which he took off and, while in the victims' backyard, he put on pants, Nike shoes, a jacket, a bandana, an orange ski mask, and a pair of glasses. When asked by the detective why he went to the victim's residence, defendant responded that they were old and vulnerable. He also said that the victims were a doctor and a teacher, and he assumed that they had money. He explained that he planned to purchase a vehicle with the money. Detective Carollo subsequently asked defendant about an alleged accomplice who defendant had told the victims would blow up the victim's house

and kill them. Defendant explained that he told them this to threaten them and stated that he was just trying to scare them.

## ASSIGNMENTS OF ERROR

1. The Appellant's rights to a fair trial and Due Process, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Art. 1, §§ 2 and 16 of the Louisiana Constitution of 1974, were violated when the trial court abused its discretion and denied him the right to present his defense and right to confront the victim.

2. The Appellant's rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution and Article 1 § 5 of the Louisiana Constitution of 1974 were violated with the introduction of the statement at trial that was not free and voluntary.

3. The sentence imposed by the trial court is unconstitutionally excessive and the trial court failed to comply with the requirements of La. C.Cr.P. art. 894.1 and the statutory mandates of La. R.S. §15:574.4.

4. The testimony at trial was insufficient to prove an essential element of the crime of Aggravated Kidnapping.

5. The trial court erred by failing to suppress the show up identification made by both victims that was unduly suggestive.

## DISCUSSION

### Assignment of Error #4

We first address defendant's fourth assignment of error, in which he argues that the testimony at trial was insufficient to prove an essential element of the crime of aggravated kidnapping. When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the evidence in its entirety. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781,

61 L.Ed.2d 560 (1979), could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. *Hearold*, 603 So.2d at 734. When addressing the sufficiency of the evidence, consideration must be given to the entirety of the evidence, including inadmissible evidence that was erroneously admitted, to determine whether the evidence is sufficient to support the conviction. *Id. See also State v. Griffin*, 14-251 (La. App. 5 Cir. 3/11/15), 169 So.3d 473, 483.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Leach*, 22-194 (La. App. 5 Cir. 12/28/22), 356 So.3d 531, 541. Defendant did not file such a motion in this case, but the failure to file a motion for post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. *State v. Faciane*, 17-224 (La. App. 5 Cir. 11/15/17), 233 So.3d 195, 205, *writ denied*, 17-2069 (La. 10/8/18), 253 So.3d 797.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 319; *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, *writ denied*, 21-274 (La. 4/27/21), 314 So.3d 838, *cert. denied*, -- U.S. --, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021). This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. Hayman*, 20-323 (La. App. 5 Cir. 4/28/21), 347 So.3d 1030, 1040. A reviewing

court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but instead whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *Id.*

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Lloyd*, 21-645 (La. App. 5 Cir. 8/24/22), 348 So.3d 222, 231, *writ denied*, 22-1354 (La. 11/22/22), 350 So.3d 499. Where circumstantial evidence forms the basis of a conviction, the circumstances must be so clearly proven that they point not merely to the possibility or probability of guilt, but to the moral certainty of guilt. *State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 501, *writ denied*, 15-685 (La. 2/26/16), 187 So.3d 468. "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Id.* (citing La. R.S. 15:438). This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. *State v. Manuel*, 20-172 (La. App. 5 Cir. 6/2/21), 325 So.3d 513, 539, *writ denied*, 21-926 (La. 10/12/21), 325 So.3d 1071.

Here, defendant challenges the sufficiency of the evidence only as to the aggravated kidnapping convictions (counts one and two).[7] The crime of aggravated kidnapping is set forth in La. R.S. 14:44, which provides:

> Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
>
> (1) The forcible seizing and carrying of any person from one place to another; or
>
> (2) The enticing or persuading of any person to go from one place to another; or
>
> (3) The imprisoning or forcible secreting of any person.

Defendant asserts that the evidence was insufficient to establish the element of aggravated kidnapping that requires the forcible seizing and carrying of a victim from one place to another. He contends that the State offered no direct evidence to prove that defendant entered the residence with the intent to take the victims to the bank. Instead, defendant claims that the evidence shows that the victims suggested going to the bank in order to escape. Moreover, defendant points out that Dr. Kokatnur did not testify at trial, and the bank manager's testimony about Dr. Kokatnur's statements were inadmissible hearsay.

The State responds that the evidence was sufficient to allow a rational trier of fact to conclude that defendant was guilty of aggravated kidnapping. The State

---

[7] Even though the sufficiency of the evidence as to the aggravated burglary conviction (count three) is not raised, our review of the record reveals that the State presented sufficient evidence under the *Jackson* standard to establish the essential statutory elements of this charge under La. R.S. 14:60. To prove the crime of aggravated burglary, the State must prove beyond a reasonable doubt that the defendant made an unauthorized entry of a structure with the intent to commit a theft or a felony. The State also must prove beyond a reasonable doubt one of the three aggravating circumstances listed in La. R.S. 14:60. *State v. Pike*, 18-538 (La. App. 5 Cir. 5/8/19), 273 So.3d 488, 502, *writ denied*, 19-927 (La. 2/10/20), 292 So.3d 60. The State presented sufficient evidence to prove that defendant was armed with a dangerous weapon in the Kokatnur's home after having unlawfully entered with the intent to commit a felony or theft therein.

contends that even if it is unclear who initially suggested going to the bank, the evidence established that defendant forcibly seized the victims and forced them to get in their car and drive to the bank with the intent to force them to turn over money to secure their release.

Aggravated kidnapping is a specific intent crime. Proof of intent to extort can be shown by "analyzing whether a reasonable person in the victim's position would believe that [he] would not be safely released unless [he] complied with the kidnapper's demands." *State v. Amos,* 15-954 (La. App. 4 Cir. 4/6/16), 192 So.3d 822, 828 (citing *State v. Arnold,* 548 So.2d 920, 924 (La. 1989)).

In this case, the jury was instructed that aggravated kidnapping was the forcible seizing and carrying of any person from one place to another. When the State relies upon the "forcible seizing" provision of the aggravated kidnapping statute, the State is required to prove: (1) the forcible seizing, and; (2) the carrying of any person from one place to another (the asportation element); (3) with the intent to force the victim, or some other person, to give up anything of apparent present or prospective value (the extortion element); (4) in order to secure the release of that person. *State v. Roblow*, 623 So.2d 51, 57 (La. App. 1st Cir. 1993) (citing *Arnold*, 548 So.2d at 923). The term "from one place to another" requires evidence that the offender relocated the victim from one physical setting or environment to another. *State v. Davillier,* 99-1204 (La. 12/10/99), 752 So.2d 149, 150.

In *Arnold*, 548 So.2d at 920, the Louisiana Supreme Court held that there is no question that a victim who was grabbed in the parking lot of a grocery store, forced inside her truck, and threatened with a knife if she resisted, was forcibly seized, and the first element was satisfied. The Court further found that the second element was satisfied because the defendant drove the victim from one parking lot to another in an attempt to isolate the victim from passersby. The Court determined

that any rational trier of fact could have found that the essential elements of the crime of aggravated kidnapping were proven beyond a reasonable doubt). *See also State v. Orbro*, 10-1289 (La. App. 3 Cir. 5/4/11), 64 So.3d 410, 417-18, *writ denied*, 11-1105 (La. 11/14/11), 75 So.3d 940 (finding sufficient evidence to support a second-degree kidnapping conviction where the defendant, armed with a pistol, forced his estranged wife from her place of business, through the parking lot, and across the street while pointing a gun at her).[8]

Here, the evidence presented at trial was sufficient to prove that defendant forcibly seized the victims and carried them from one place to another. Mrs. Kokatnur's testimony showed that defendant, while armed with a gun, forced the victims to leave their home, get in their car, and drive to Chase Bank. On the way to the bank, defendant held a gun to Dr. Kokatnur's head. Mrs. Kokatnur stated on several occasions that she was scared and she believed defendant would kill her husband. She asserted that she lied to defendant in order to save her husband's life.

Moreover, defendant confessed to the offenses in his videorecorded statement. He informed the detective that Mrs. Kokatnur told him that they would need to go to the bank for money. He told them to get in the car, where he claims that he placed the gun on the center console of the vehicle and instructed the Kokatnurs to not ask questions and to drive.

Defendant's suggestion that the elements of aggravated kidnapping were not met because the victims voluntarily got in their vehicle to travel to the bank is belied by the evidence showing that defendant demanded money while he held a loaded gun on the victims, hurried the Kokatnurs into the vehicle, and pointed the gun at Dr. Kokatnur en route. The evidence also established that defendant told the

---

[8] Although the crime at issue in *Orbro* was second-degree kidnapping, the First Circuit noted that the "forcible seizing and carrying" elements are identical for aggravated kidnapping and second-degree kidnapping, and therefore are useful in the analysis. *State v. Westbrook*, 14-1055 (La. App. 1 Cir. 12/23/14), 2014 WL 7338523, at *8 (unpublished opinion), *writ denied*, 15-175 (La. 11/30/15), 184 So.3d 32.

victims that an accomplice would blow up their house and kill them if they did not cooperate. Even if aggravated kidnapping was not defendant's original intention upon entering the victims' residence, it became his intention when the victims said that they did not have the money in their house. Defendant rode with the victims to the bank while holding them at gunpoint, thereby escalating the situation. The evidence in the record supports a finding that defendant forcibly seized and carried the victims from one place to another in satisfaction of the elements of aggravated kidnapping.

The jury heard all the evidence presented at trial and entered a unanimous verdict of guilty. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient, under the standard set forth in *Jackson*, to support defendant's convictions for two counts of aggravated kidnapping. This assignment of error lacks merit.

## Assignment of Error #1

In this assignment of error, defendant argues that he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights to face his accuser when the trial court precluded him from calling Dr. Kokatnur to testify at trial. Defendant asserts that this prohibited his counsel from questioning this victim, thereby limiting the defense's ability to explore issues like misidentification, recantation, and the elements of aggravated kidnapping. Defendant further asserts that the court allowed testimony that contained inadmissible hearsay statements by Dr. Kokatnur. Defendant claims that the victim's unavailability to testify was not established on the record, and the trial court made no effort to arrange for him to testify. Defendant argues that the defense was lulled into a belief that this victim would be called in the State's case.

The State responds that the trial court did not err in denying counsel's oral motion for mistrial when one of the victims did not testify at trial. The State argues that defendant was not denied the ability to secure Dr. Kokatnur's appearance at trial, nor was defendant prohibited from doing so. The State claims that the defense did not subpoena the victim or move to perpetuate his testimony despite being advised on previous occasions that the victim's health was declining. The State further claims that the defense has not established that the victim was capable of testifying at trial.

Additionally, the State contends that the complained-of hearsay testimony was actually elicited during defense counsel's cross-examination of Mrs. Kokatnur about Dr. Kokatnur's statements made to her, and that it resulted in a sustained objection to hearsay. The State further denies that the trial court prevented the defense from questioning Detective Jerry about Dr. Kokatnur's identification and maintains that the court allowed defense counsel to ask Detective Hymel about the identification. Defendant therefore was not precluded from placing the information related to Dr. Kokatnur's identification before the jury. Regardless, the State contends that any alleged error would be harmless error.

On the second day of trial, Mrs. Kokatnur testified that Dr. Kokatnur was at home recovering because he had a small stroke. She indicated that he could talk, "but very little," and that he could take a walk at their home using a walker. When asked by the defense if Dr. Kokatnur directly told her that he did not think defendant was the person involved, Mrs. Kokatnur answered, "Yeah, he just in the living room and he said, I think Alexsy came to our house. That's what came in his mind." She reiterated that Dr. Kokatnur said, "I think it was Alexsy. That's all he say." The trial judge sustained the State's objection to hearsay.

Defense counsel subsequently asked JPSO Detective Jerry on cross-examination if he interviewed the alleged victims, which he confirmed. When

counsel attempted to ask Detective Jerry about Dr. Kokatnur's percentage of certainty of his identification, the State again objected that it was hearsay because Dr. Kokatnur had not testified, and the trial court sustained the objection.[9]

Later, JPSO Detective Hymel testified that he met with the victims, and on cross examination, defense counsel asked if Dr. Kokatnur said he was only "ninety percent sure," to which Detective Hymel agreed.

After the State rested its case, during another bench conference, defense counsel moved for the matter to be dismissed. The trial court excused the jury and the defense moved for a mistrial, alleging a *Brady*[10] violation because the State failed to disclose that Dr. Kokatnur would not be called as a witness. In response, the State asserted that the defense was told about Dr. Kokatnur's declining health and that the State had asked defendant to pick a "date to perpetuate his testimony." The prosecutor explained that she personally visited Dr. Kokatnur in his home and observed that he could not sit up or speak. In any event, the State maintained that Dr. Kokatnur was not required to testify, even if his name appeared on the State's witness list.

Defense counsel alleged that there was no proof or evidence that Dr. Kokatnur was unavailable and denied that he was asked to take his deposition for perpetuation purposes. The trial court denied defendant's motion for a mistrial. When the jury returned, defense counsel said: "Your Honor, I'd like to call Mr. Mohan Kokatnur to the witness stand." The trial court denied the request.

"A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial." *State v. Smith*,

---

[9] At a bench conference, defense counsel stated that he wanted to ask: "Basically, did he say that he was only ninety percent sure that it was Mr. Mejia? If I would ask if he could identify him, he said he was only ninety percent sure." The court asked for the answer to the objection, and the State replied, "He was ninety percent sure."
[10] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

04-340 (La. App. 5 Cir. 10/26/04), 888 So.2d 280, 285. "Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion." *Id.* The standard to judge whether a mistrial should have been granted is whether the defendant "suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial." *State v. Smith*, 433 So.2d 688, 696 (La. 1983) (citing *State v. Cushenberry*, 407 So.2d 700 (La. 1981)).[11]

The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront witnesses against him. *State v. Jackson*, 03-883 (La. App. 5 Cir. 4/27/04), 880 So.2d 841, 852, *writ denied*, 04-1399 (La. 11/8/04), 885 So.2d 1118. In *Crawford v. Washington*, 541 U.S. 36, 53-4, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The Court held that the admission of a recorded statement made by the defendant's wife during interrogation violated the defendant's right under the Confrontation Clause because the statement was hearsay, because it was testimonial in nature, and because his wife did not testify at trial due to the State's marital privilege. *Id.*

Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801. Hearsay evidence is not admissible except as otherwise specified in the Code of Evidence or other legislation. La. C.E. art. 802.

---

[11] Defendant does not argue on appeal that the trial court abused its discretion in denying his motion for mistrial, and none of the instances in which a mandatory mistrial must be declared appear to exist here. *See* La. C.Cr.P. art. 770.

Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. *State v. Hernandez*, 11-712 (La. App. 5 Cir. 4/10/12), 93 So.3d 615, 624, *writ denied sub nom. State ex rel. Hernandez v. State*, 12-1142 (La. 9/28/12), 98 So.3d 834. Although a statement may constitute inadmissible hearsay, if the statement is merely cumulative or corroborative of other evidence, the admission of the evidence is harmless error. *State v. Hester*, 99-426 (La. App. 5 Cir. 9/28/99), 746 So.2d 95, 107, *writ denied sub nom. State v. Patterson,* 99-3217 (La. 4/20/00), 760 So.2d 342.

Defendant complains that the State introduced multiple hearsay statements of Dr. Kokatnur at trial but that the trial court refused to allow the defense to probe into "this testimony as hearsay" by questioning Dr. Kokatnur directly. Defendant further complains that he was not allowed to question Detective Jerry concerning the lack of a positive identification by Dr. Kokatnur, because the trial court sustained the State's objection based on hearsay. The record reveals, however, that the trial court subsequently allowed Detective Hymel to respond to defense counsel's question regarding Dr. Kokatnur's identification. The record further reveals that Mrs. Kokatnur's complained-of testimony was actually elicited by the defense. The Louisiana Supreme Court has held that defense counsel cannot claim reversible error based on evidence that the defense elicited. *State v. Kimble*, 375 So.2d 924, 928-29 (La. 1979). On appeal, defendant does not point to any further instances in which the defense objected to any witness testimony based on allegations of hearsay.[12]

---

[12] The defense elicited further details regarding the identification when cross-examining Officers L. Vega and M. Vega. Moreover, defense counsel did not object to Mrs. Kokatnur's testimony regarding the identification, and on cross-examination, he elicited more information from her as to the identification. *See* La. C.Cr.P. art. 841(A) ("An irregularity cannot be availed of after verdict unless it was objected to at the time of occurrence.").

La. C.Cr.P. art. 61 provides, in pertinent part: "[T]he district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." Thus, the State may choose to present its case through evidence and the testimony of only one of the victims. Considering that the defense elicited certain hearsay testimony and that Dr. Kokatnur's testimony, had it been obtained, would have been cumulative of other testimony given at trial, under these circumstances, we do not find that defendant's rights of confrontation were violated when Dr. Kokatnur failed to testify.

Even if defendant's right to confrontation was violated, however, such a violation is subject to a harmless error analysis. *State v. Payne*, 17-553 (La. App. 5 Cir. 10/17/18), 258 So.3d 1015, 1023, *writ denied*, 18-1932 (La. 4/15/19), 267 So.3d 1122. An error is harmless when the guilty verdict surely was not attributable to the error. Whether an error is harmless in a particular case depends upon many factors, including: (1) the importance of the witness's testimony; (2) whether the testimony was cumulative in nature; (3) whether corroborating or contradictory evidence regarding the major points of the testimony existed; (4) the extent of cross-examination permitted; and (5) the overall strength of the State's case. *Id.*

Dr. Kokatnur's testimony was likely to have been cumulative of Mrs. Kokatnur's testimony and would have corroborated the key aspects of her version of events. Mrs. Kokatnur's identification of defendant as the perpetrator, as well as her version of the events of that day, were further corroborated by law enforcement testimony. Additionally, the State presented physical evidence such as gloves, defendant's cellphone, and Nike shoes that linked defendant to the suspect who exited the victims' vehicle at the bank and ran. Finally, the evidence includes

defendant's recorded confession. Thus, any error in the omission of Dr. Kokatnur's testimony at trial constituted harmless error. This assignment of error lacks merit.

## Assignment of Error #2

Defendant argues in his second assignment of error that the trial court erred in denying his motion to suppress the statement because it was obtained in violation of his constitutional rights, as it was not free and voluntarily given. At the time he provided a statement to law enforcement, defendant was only 16 years old and although his mother was present for the discussion of his *Miranda*[13] rights, defendant claims that law enforcement ignored her requests for an attorney and that the language barrier gave the officer the opportunity to rebuff his mother's inquiry about her son's right to counsel. Defendant further argues that he and his mother were not advised of the charges against him, and asserts that Detective Falcon improperly translated during trial.

The State argues that defendant's statement is admissible and that the Juvenile Rights form was explained to defendant and to his mother, through a translator, and defendant was less than four months away from his seventeenth birthday and had completed the tenth grade. The State points out that defendant and his mother were aware of the serious and violent nature of the offense, and the video evidence of defendant's statement shows that he wished to speak with the detectives without his mother present. The State further maintains that defendant mistakenly alleges that his mother invoked his right to counsel on his behalf. Finally, the State argues that defendant has not alleged any prejudice concerning Detective Falcon's translation of the video.

---

[13] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On August 25, 2022, the trial court held a hearing on defense counsel's oral motion to suppress identifications and statement.[14] At the hearing, JPSO Detective Falcon testified that on July 19, 2021, he was advised that someone who spoke Spanish was needed to go over defendant's Juvenile Rights form, that he is fluent in Spanish, and that he often translates for other deputies who do not speak Spanish. Detective Falcon testified that he went over defendant's rights with defendant and his mother, as enumerated in the Juvenile Rights Form, which was written in both Spanish and English. He testified that defendant's mother was in the room when he went over the rights form, and that she and defendant both signed the form, indicating that they understood defendant's rights. The State played a few seconds of the video, at which point Detective Falcon identified himself, Detective Carrollo, defendant, and defendant's mother, and the section of the video in which he reviewed the rights form with defendant and his mother. The trial court admitted the portion of the video showing defendant and his mother being informed of defendant's rights into evidence.

Detective Falcon explained that he made sure defendant's mother understood the form.[15] He noted that defendant spoke English and Spanish fluently, so he was interpreting for defendant's mother only. Once the defendant and his mother had been informed of defendant's rights, Detective Falcon testified that defendant asked his mother to leave, and Detective Falcon left as well.

---

[14] A motion to suppress should be in writing. *See State v. Simmons*, 08-269 (La. App. 5 Cir. 10/28/08), 996 So.2d 1177, 1182 n.1, *writ denied*, 09-15 (La. 9/25/09), 18 So.3d 81 (citing *State v. Royal*, 255 La. 617, 232 So.2d 292 (1970)).

[15] Detective Falcon testified that the first section on page one regarding the *Miranda* warnings was reviewed with both defendant and his mother but that there was no place for their signatures on the first page. He pointed out that on page one, they were advised that the suspect could request an attorney at any time during questioning. Detective Falcon agreed that the top section on page two did not advise defendant or his mother that they had a right to have a lawyer present during questioning. He noted that the top section said that the suspect has a right to stop answering questions at any time. Detective Falcon further testified that the second section at the bottom of page two titled, "Juvenile's Waiver of Rights," was only signed by defendant. He agreed that this section did not advise defendant that he had the right to have an attorney present during questioning.

Detective Falcon testified that neither defendant nor anyone else indicated to him that they wished to have a lawyer present. Detective Falcon believed that defendant's statement was free and voluntary.

The trial court denied defendant's motion to suppress the statement and identification at the conclusion of the suppression hearing. Defendant filed a writ application challenging the trial court's ruling.[16] This Court denied the writ, finding that the trial court did not abuse its great discretion in denying defendant's oral motion to suppress. *Mejia*, 22-K-461.

At the time that defendant's statement was admitted into evidence at trial, defense counsel re-urged the "original motion" to suppress, and the trial court noted the objection from defendant but permitted the statement to be offered, filed and introduced into the record. Although not required to do so, an appellate court may review the testimony adduced at trial in addition to the testimony adduced at the suppression hearing in determining the correctness of the trial court's pretrial ruling on a motion to suppress. *State v. Mitchell*, 15-524 (La. App. 5 Cir. 12/9/15), 182 So.3d 365, 373.

At trial, Detective Falcon was subject to more in-depth questioning than at the suppression hearing, and he translated for the jury the portion of the video pertaining to notifying defendant and his mother of defendant's rights. Although

_____

[16] In his writ application, defendant argued that his statement was obtained in violation of his constitutional rights; that the evidence did not show that he was fully advised of his *Miranda* rights before he made the statement; that it was unclear if he was informed of his right to have an attorney present before and during questioning; and that the *Miranda* warnings given to him were ambiguous at best, and therefore, his statement should have been suppressed. Defendant noted that the first page of the Juvenile Rights Form introduced at the hearing states that the suspect has the right to talk with a lawyer before being asked any questions and to have a lawyer present during questioning, but this page is not signed or acknowledged by him or his mother. Defendant asserted that the signed acknowledgement by his mother on the second page acknowledges that his mother advised him only that he had the right to an attorney appointed to represent him without cost to him. He also asserted that his mother never acknowledged that she advised him that he had the right to talk with a lawyer for advice before he was asked any questions and to have the lawyer with him during questioning. Further, defendant argued that he was not personally informed that he had the right to talk with a lawyer before questioning and have the lawyer with him during questioning, as reflected by the portion of the form that was left blank. Additionally, he pointed out that Detective Falcon testified at the hearing that immediately after executing the form, his mother left the room. Thus, his mother was not present with him during his interrogation.

the defense objected because Detective Falcon was not a certified interpreter, defendant never objected on the basis that defendant's mother had invoked his right to counsel or that defendant was not properly informed of the charges against him.[17]

On appeal, defendant attempts to offer these new arguments in favor of suppressing the statement for the first time. Yet defendant did not file a written motion to suppress and did not present these arguments at the suppression hearing.[18]

La. C.Cr.P. art. 841(A) provides: "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Articulating a new basis for the motion to suppress for the first time on appeal is prohibited under La. C.Cr.P. art. 841, because the trial court would not be afforded an opportunity to consider the merits of the particular claim. *State v. Berroa-Reyes*, 12-581 (La. App. 5 Cir. 1/30/13), 109 So.3d 487, 496.[19] As such, in failing to object on these grounds at trial, defendant waived these issues on appellate review.

Moreover, Detective Falcon's trial testimony regarding the circumstances surrounding defendant's statement appears to be largely consistent with the testimony presented at the suppression hearing. As such, to the extent that

---

[17] Detective Falcon testified at trial that he told defendant's mother that defendant was charged with attempted armed robbery—that a firearm was involved—and that she understood this.

[18] Defendant primarily argued in his writ application that the *Miranda* warnings he was given were ambiguous, and that his mother was absent when he gave his statement. *See* 22-K-461.

[19] A defendant bears the burden of asserting the basis for his motion to suppress in order to give the State adequate notice so that it may present evidence and address the issue. La. C.Cr.P. art. 703(E); *State v. Jackson*, 04-1388 (La. App. 5 Cir. 5/31/05), 904 So.2d 907, 911, *writ denied*, 05-1740 (La. 2/10/06), 924 So.2d 162; *State v. Smith*, 94-120 (La. App. 5 Cir. 5/31/94), 638 So.2d 452, 455. After the defendant files a motion to suppress, the State has the burden to prove the defendant's confession was of a free and voluntary nature. La. C.Cr.P. art. 703(D); *Jackson*, *supra*. Therefore, on appeal, the defendant is limited to the grounds he articulated at trial, and a new basis for the claim, even if it would be meritorious, cannot be raised for the first time on appeal. *State v. Sam*, 11-469 (La. App. 5 Cir. 2/14/12), 88 So.3d 580, 585, *writ denied*, 12-631 (La. 9/12/12), 98 So.3d 301. *See also* La. C.Cr.P. art. 703(F); *State v. Montejo*, 06-1807 (La. 5/11/10), 40 So.3d 952, 967, *cert. denied*, 562 U.S. 1082, 131 S.Ct. 656, 178 L.Ed.2d 513 (2010); *State v. Brown*, 434 So.2d 399 (La. 1983) (rejecting the defendant's alternative argument regarding the denial of his motion to suppress because he had not raised the issue at trial).

Detective Falcon's additional testimony constitutes new evidence, it does not alter this Court's previous determination that the trial court did not err in denying the motion to suppress defendant's statement.

Defendant also takes issue with the fact that at trial, Detective Falcon translated the portion of defendant's statement in which he went over the Juvenile Rights Form with defendant and his mother. During the trial testimony, the defense objected to the video being played for the jury, arguing there was no English translation of what Detective Falcon said to defendant's mother. The prosecutor therefore asked Detective Falcon to translate, and defense counsel objected, arguing that Detective Falcon was not offered as an interpreter. Detective Falcon confirmed that he is not certified by the Louisiana Supreme Court as an interpreter. The trial court overruled counsel's objection.

La. C.E. art. 604 provides that an interpreter is subject to the provisions of the Code of Evidence relating to qualification as an expert and the administration of an oath or affirmation that he will make a true translation. An interpreter of foreign-language testimony must be competent and qualified by virtue of knowledge, skill, experience, training, or education, have no substantial interest in the proceedings, and be sworn to give a true bilateral translation of the questions and answers given during testimony. *Thongsavanh v. Schexnayder*, 09-1462 (La. App. 1 Cir. 5/7/10), 40 So.3d 989, *writ denied*, 10-1295 (La. 9/24/10), 45 So.3d 1074. An interpreter should be a neutral and detached individual whose abilities are first screened by the court and who is sworn to make a true, literal and complete bilateral translation. *State v. Tamez*, 506 So.2d 531, 533 (La. App. 1 Cir. 1987).

We have located no Louisiana cases directly on point, but in *People v. Munoz-Casteneda*, 300 P.3d 944, 947 (Colo. App. 2012), *cert. denied*, 2013 WL 1409900 (2013), the defendant contended that the trial court erred by allowing the

detective who interrogated him to translate the recorded interrogation during his trial testimony without meeting the requirements for interpreters set forth in Federal Rules of Evidence 604 and 702. The court discussed the functional distinction between court-certified interpreters and fact witnesses, concluding that as long as the translating witness has personal knowledge of the relevant conversation or evidence, is capable of testifying to a translation of its contents without misleading the jury, and is subject to cross-examination, he may testify without first being certified as an interpreter. *Munoz-Casteneda*, 300 P.3d at 948-49.

Here, Detective Falcon was present at the interview only to interpret defendant's rights for his mother. Although Detective Falcon was not certified or sworn by the court as an official interpreter, he had personal knowledge of the relevant conversation, there is no indication that he was not sufficiently capable of translating a recording of the conversation without misleading the jury, and he was subject to extensive cross-examination by defense counsel. As such, we see no error in the trial court's decision to overrule defendant's objection and to permit Detective Falcon to translate for the jury his conversation with defendant and his mother.

Defendant's second assignment of error lacks merit.

## Assignment of Error #5

In this assignment of error, defendant maintains that the trial court erred in denying his motion to suppress identifications because the victims identified him during an impermissibly suggestive "show-up" procedure. He contends that the victims, who were driven to the location and viewed him from the back seat of a police unit, identified him only by his clothing and his body stature. Defendant further points out that Mrs. Kokatnur testified that a police officer told her that he was found hiding in a garbage can. He argues that the identifications by the victims

were tentative at best, noting Mrs. Kokatnur's testimony that her husband recognized defendant more than she did. As such, defendant contends that the convictions should be reversed.

The State posits that this Court correctly denied defendant's writ application seeking review of the trial court's judgment denying defendant's pre-trial motion to suppress. *See State v. Mejia*, 22-K-461. In any event, the State argues that any error in refusing to suppress the victims' identification would be harmless because the identification was merely cumulative of other testimony.

Defendant's arguments on appeal are similar to those set forth in his prior writ application. However, on appeal, defendant references the trial testimony from Officer L. Vega and Mrs. Kokatnur, who did not testify at the suppression hearing. Specifically, defendant asserts that Mrs. Kokatnur's trial testimony revealed that the police told her that the individual they were identifying was found hiding in a garbage can.

A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. *State v. McQuarter*, 19-594 (La. App. 5 Cir. 11/25/20), 305 So.3d 1055, 1073, *writ not considered*, 21-295 (La. 8/6/21), 322 So.3d 247. In determining whether the trial court's ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing but may also consider the evidence presented at trial. *Berroa-Reyes*, 109 So.3d at 495.

Pursuant to La. C.Cr.P. art. 703(D), defendants have the burden of proof on a motion to suppress an out-of-court identification. *State v. Newsome*, 19-439 (La. 5/28/19), 273 So.3d 305, 306. A defendant challenging an identification procedure has the burden of proving that the identification was suggestive, and there was a substantial likelihood of misidentification as a result of the identification process. An identification procedure is suggestive if, during the procedure, the witness's

attention is unduly focused on the accused. Even if an identification procedure is suggestive, it is the likelihood of misidentification, not the mere existence of suggestiveness, which violates due process. *State v. Torrence*, 14-819 (La. App. 5 Cir. 2/25/15), 168 So.3d 870, 876, *writ denied*, 15-627 (La. 2/5/16), 186 So.3d 1163.

Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Factors to consider in assessing the reliability of an identification include: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Torrence*, 168 So.3d at 876; *State v. Walker*, 10-536 (La. App. 5 Cir. 5/10/11), 66 So.3d 486, 492, *writ denied*, 11-1103 (La. 11/23/11), 76 So.3d 1149 (citing *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977)).

Although show up or one-on-one identifications are not favored in law, circumstances may justify the use of such procedures. One such exception is when the suspect is apprehended and viewed soon after the crime. Such immediate identifications increase accuracy in identification and provide for the expeditious release of innocent suspects. *Torrence*, 168 So.3d at 876.

At the suppression hearing, Detective Brad Ricke with the Kenner Police Department testified that he responded to the scene at the Chase Bank located on Williams Boulevard in Kenner. He explained that he was asked by one of the patrol division supervisors to place the two victims in the back of his unit because it was raining on and off. He was then asked to bring them to where the subject was detained for a "show up" identification. He drove to where the subject was detained with the two victims in the back of his unit approximately thirty minutes

after the offense. He asked the victims if they recognized the subject, and they stated that they did, making a positive identification. He did not fully interview them after the identification, but the victims indicated that they knew defendant because "he was a groundkeeper or a gardener or something of that sort at their house." They stated that they recognized him as the perpetrator and that they also recognized him because he was their groundskeeper or gardener. The show up took approximately two minutes and the victims "got full view of him" about thirty yards away in a "pretty empty parking lot."

Detective Ricke testified that he made sure that the victims could see the defendant clearly, and they stated that they could, viewing him through the windshield and between both of the front seats. Detective Ricke noted that he parked with the front of his vehicle facing defendant and did not have a cage in the back of his unit. Detective Ricke believed defendant was handcuffed, standing next to a patrol car, and that an officer accompanied him. To the detective's recollection, there was no other person visible in the general area. Detective Ricke did not recall what defendant was wearing. Detective Ricke denied getting into the details of the crime with the victims.

At trial, the testimony of Officers M. Vega and L. Vega regarding the circumstances of defendant's identification appears to be largely consistent with that presented at the suppression hearing. Officer L. Vega described that for the identification procedure, the victims were placed in the back of a police unit, the suspect was presented, and the victims positively identified him from his clothing and his body stature. She indicated that the victims were only shown the perpetrator, who was alone, handcuffed, and near a police unit. Officer M. Vega stated that he was on the scene when defendant was taken out of the back of a police car and the victims identified defendant. He indicated that the victims were also in an unmarked police car at the time. Officer Vega explained that he only

knew defendant was positively identified as the subject who forced them into the bank.

At trial, Mrs. Kokatnur confirmed that the police asked her to do an identification, and they told her and her husband to sit in a police vehicle. She indicated that they stopped the car and showed the suspect to her as she and her husband looked out of the front window of the police car. She confirmed that she was shown the individual who held her and her husband at gunpoint. She described, "I could see his figure and all. Like we could recognize." She said that the "police lady" told them: "Don't worry, we caught him, he was hiding in the garbage can." She further indicated that the suspect was fifteen feet away from them. Defense counsel asked: "And the police told you that that was the person that was at your house?" She replied "yes." She denied knowing what kind of clothing the suspect wore.

In *State v. Robinson*, 09-922 (La. App. 4 Cir. 3/10/10), 50 So.3d 158, 165-66, *writ denied*, 10-824 (La. 11/5/10), 50 So.3d 813, the Court found that the show up identification was clearly suggestive where the victim identified the defendant after the defendant was placed in the middle of a neutral ground, handcuffed, bleeding, and surrounded by police. Further, shortly before the identification, one of the officers said that the police had apprehended one of the men who robbed the victim. However, the Court concluded that the circumstances did not indicate there was a substantial likelihood of misidentification after applying the *Manson* factors to the totality of the circumstances, noting that the police arrived on the scene before the victim finished talking to the 9-1-1 operator, the victim identified the defendant within twenty to twenty-five minutes of the robbery, the victim was certain of his identification of the defendant because the defendant had pointed a gun at him, the victim knew the defendant's eyes and face because the defendant

had "looked dead at [him]" during the robbery, and the victim's description was consistent throughout the process.

In *State v. Briley*, 13-1421 (La. App. 4 Cir. 10/1/14), 151 So.3d 633, the court of appeal found that an arguably suggestive show-up identification procedure after a robbery did not result in a likelihood of misidentification. There, the defendant was in the spotlight, handcuffed, flanked by at least one officer, and the hood of his sweatshirt was raised over his head and lowered. The *Briley* court applied the *Manson* factors, reasoning that the defendant's show-up identification, although arguably suggestive, did not create a substantial likelihood of misidentification, considering that the victim had ample lighting and an opportunity to view the perpetrator at the time of the crime; the victim's attention was focused on the perpetrator; the victim's description of the defendant to the police; the certainty of his identification, although he was nervous and "kind of freaked out at first;" and approximately twenty hours had lapsed between the crime and the identification. *Id.* at 644-46. *See also State v. Glenn*, 49,705 (La. App. 2 Cir. 2/26/15), 162 So.3d 525, 529-30 (finding that although the identification procedure was arguably suggestive, the totality of the circumstances did not indicate that there was a substantial likelihood of misidentification).

The victims in the present case did not testify at the suppression hearing. However, Detective Ricke's testimony indicates that the positive identifications took approximately two minutes. The victims were able to see the suspect clearly, and they knew defendant through his prior employment at their house. The identifications were made approximately thirty minutes after the offense. *See State v. Brown*, 09-884 (La. App. 4 Cir. 3/31/10), 36 So.3d 974, 980, *writ denied sub nom. State ex rel. Brown v. State*, 10-1120 (La. 4/29/11), 62 So.3d 105 (noting that when considering the length of time between the crime and the confrontation, "[t]his temporal factor is generally satisfied when the identification occurs within

an hour of the crime."). The circumstances of this case appear to justify this show-up procedure as defendant was apprehended shortly after the offense.

Although the show-up identification was suggestive because of its undue focus on defendant, we find no substantial likelihood of misidentification under the circumstances of this case, given that the victims already knew defendant. *See State v. Winding*, 00-364 (La. App. 4 Cir. 4/11/01), 787 So.2d 385, 390, *writ denied*, 01-1445 (La. 4/19/02), 813 So.2d 417 ("Because both witnesses already knew the defendant, there was not a substantial likelihood of misidentification from the use of the one-on-one identification procedure."); *State v. Love*, 611 So.2d 753, 755 (La. App. 4 Cir. 1992), *writ denied*, 93-1384 (La. 12/15/95), 664 So.2d 434 (finding no substantial risk of misidentification in the one-on-one identification).

Based on the testimony elicited at the suppression hearing and at trial, we find no error in the trial court's ruling denying the motion to suppress the show-up identifications. The positive identifications took approximately two minutes and were made shortly after the offense. The victims were able to clearly see the suspect, whom they knew before the incident, at the time of the identifications. Defendant's fifth assignment of error lacks merit.

## Assignment of Error #3

Defendant argues in his third assignment of error that his sentences are constitutionally excessive and that the trial court failed to comply with the requirements of La. R.S. 894.1 and the statutory mandates of La. R.S. 15:574.4 when sentencing him. He avers that there were several mitigating factors, and that the court failed to consider the constitutional and statutory provisions that relate to sentencing of juvenile offenders under *Miller v. Alabama* and its progeny.[20]

---

[20] In *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2466, 183, L.Ed.2d 407 (2012), the United States Supreme Court held that a State's sentencing scheme that mandates life imprisonment without parole for those offenders under the age of eighteen at the time they

Defendant maintains that he is subject to parole after serving twenty-five years of his sentence pursuant to La. R.S. 15:574.4(D) and La. R.S. 15:574.4(J).

The State contends that the trial court did not abuse its broad sentencing discretion, and that the trial court did not fail to consider the factors set forth in La. C.Cr.P. art. 894.1. The State also asserts that the trial court noted that defendant will be eligible for parole consideration under La. R.S. 15:574.4.

At the November 9, 2022 sentencing hearing, the State presented a victim impact statement from the victims and a letter from Sharmila Mulkey, the victims' daughter, who discussed the negative impact that the perpetrator had on her parent's outlook on safety in their home. The trial court then set forth detailed reasons for defendant's sentence. Among other factors, the trial court noted the advanced age of the victims; the fact that defendant used a dangerous weapon to threaten them; that defendant told the victims he had an accomplice who would burn their house down if they called the police; defendant's deliberate cruelty toward people who previously had been kind to him; and defendant's admission that he preyed on them because they were old and couldn't fight back, referencing La. C.Cr.P. art. 894.1.

On counts one and two, the trial court sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence for the offenses of aggravated battery. On count three, the trial court sentenced defendant to thirty years at hard labor without the benefit of parole, probation, or suspension of sentence, and ordered the sentences to be served concurrently. The trial court discussed the applicability of La. R.S. 15:574.4, explaining that he believed the statute "operates by operation of law." The record does not reflect that defendant orally objected at sentencing.

---

committed a homicide offense violates the Eighth Amendment prohibition against cruel and unusual punishment.

On December 2, 2022, defense counsel filed a motion to reconsider sentence, asserting that the imposed sentences were excessive and harsh in light of defendant's age and circumstances. On December 9, 2022, the trial court denied the motion to reconsider sentence without a hearing.

Failure to make or file a motion to reconsider sentence, or to state the specific grounds upon which the motion is based, limits a defendant to a review of the sentence for constitutional excessiveness only. *State v. Smith*, 16-406 (La. App. 5 Cir. 8/30/17), 227 So.3d 337, 363, *writs denied*, 17-1643 (La. 9/14/18), 252 So.3d 481, and 17-1660 (La. 9/14/18), 252 So.3d 482. When the specific grounds for objection to the sentences, including alleged non-compliance with La. C.Cr.P. art. 894.1, are not specifically raised in the trial court, then these issues are not included in the bare review for constitutional excessiveness, and the defendant is precluded from raising these issues on appeal. *State v. Clark*, 19-518 (La. App. 5 Cir. 6/24/20), 296 So.3d 1281, 1291, *writ denied*, 21-62 (La. 3/9/21), 312 So.3d 585. While the record reflects that defense counsel filed a written motion to reconsider sentence, counsel did not specifically raise the issue of the trial judge's lack of compliance with La. C.Cr.P. art. 894.1.

The Eighth Amendment to the U.S. Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. *State v. Rubio*, 22-205 (La. App. 5 Cir. 12/28/22), 357 So.3d 413, 421, *writ denied sub nom. Southland Engine Company, Inc. v. State*, 23-67 (La. 3/28/23), 358 So.3d 518. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense, or imposes needless and purposeless pain and suffering. *State v. Cepriano*, 21-262 (La. App. 5 Cir. 3/30/22), 339 So.3d 32, 46.

According to La. C.Cr.P. art. 881.4(D), the appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. *State v.*

*Woods*, 20-73 (La. App. 5 Cir. 9/9/20), 303 So.3d 403, 406, *writ denied*, 21-27 (La. 2/17/21), 310 So.3d 1150. In reviewing a sentence for excessiveness, the reviewing court shall consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court's sense of justice, while recognizing the trial court's wide discretion. *Id.*

In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. *Hayman*, 347 So.3d at 1043. There is no requirement that specific matters be given any particular weight at sentencing. *State v. Picard*, 19-593 (La. App. 5 Cir. 3/17/21), 316 So.3d 129, 140, *writ denied*, 21-570 (La. 6/22/21), 318 So.3d 704.

Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. *Hayman*, 347 So.3d at 1043. The trial judge is granted great discretion in imposing a sentence, and sentences will not be set aside as excessive absent clear abuse of that broad discretion. *State v. Brown*, 01-41 (La. App. 5 Cir. 5/30/01), 788 So.2d 694, 704-05.

Regarding the nature of the crime, the evidence indicates that on July 9, 2021, a masked male, identified as defendant, entered the elderly victims' residence through an unlocked bathroom window armed with a gun, pointed the gun at the victims, and demanded money from them. He also threatened to kill Dr. Kokatnur and told the Kokatnurs that an accomplice would blow up their house and kill them in order to scare them. During the drive to the bank, defendant held a gun to Dr. Kokatnur's head and cursed at Mrs. Kokatnur. The bank's branch manager recalled that Mrs. Kokatnur was hysterical and was crying. Law enforcement officers testified that defendant then exited the vehicle, fled the scene

on foot, and was later apprehended. The detectives found a loaded revolver inside of the victims' vehicle.

At trial, Mrs. Kokatnur described being scared by the incident. At sentencing, the victims' impact statements discussed the impact that the crime had on their family and explained that the victims had been terrified. Their statement indicated that they begged defendant not to hurt them.

Contrary to defendant's assertions, the trial court considered the sentencing guidelines of La. C.Cr.P. art. 894.1 and provided detailed reasons for the sentences imposed.[21] The trial court further considered that the incident could have resulted in a double homicide.

As to the background of the offender, although defendant was 16 years old at the time of the offenses and appears to have no criminal history, his actions showed extreme disregard for the safety of the victims, whom he knew through his prior employment. Trial testimony also established that defendant's family contacted the victims in an effort to influence the Kokatnurs to drop the charges. Additionally, the trial court considered the harmful nature of the offense and the fact that defendant targeted an elderly couple, who previously had employed him. Notwithstanding defense counsel's assertions, the trial court did consider defendant's young age at sentencing, but the court also pointed out that defendant "terrorized" the elderly victims, whom he described as "vulnerable."

The third factor requires consideration of sentences imposed for similar crimes by this Court and other courts. "Although a comparison of sentences

---

[21] For example, the trial judge listed several sections of La. C.Cr.P. art. 894.1, including but not limited to finding that defendant's conduct during the "commission of the offense manifested deliberate cruelty to the victim," and that defendant "knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health," he "used his or her position to facilitate the commission of the offense," he "knowingly created a risk of death or great bodily harm to more than one person," he "used threats of or actual violence in the commission of the offense," and he "used a dangerous weapon in the commission of the offense."

imposed for similar crimes may provide guidance, '[i]t is well settled that sentences must be individualized to the particular offender and to the particular offense committed.'" *State v. Boudreaux*, 11-1345 (La. App. 4 Cir. 7/25/12), 98 So.3d 881, 891, *writ denied*, 12-1907 (La. 11/9/12), 100 So.3d 841. While comparison with other similar cases is useful in itself and sets the stage, the focus of sentence review remains on the character and propensities of the offender and the circumstances of the offense. *State v. LeBlanc*, 09-1355 (La. 7/6/10), 41 So.3d 1168, 1173.

Aggravated Kidnapping (counts one and two)

Defendant was convicted of two counts of aggravated kidnapping. The penalty for aggravated kidnapping is life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:44. Louisiana courts have affirmed life sentences for aggravated kidnapping. *See*, *e.g.*, *State v. Gibson*, 15-1390 (La. App. 4 Cir. 7/6/15), 197 So.3d 692, *writ not considered*, 15-1530 (La. 6/5/17), 219 So.3d 337; *State v. Lebreton*, 03-321 (La. App. 4 Cir. 10/8/03), 859 So.2d 785, 798, *writ denied*, 03-3176 (La. 3/26/04), 871 So.2d 345; *State v. Hawkins*, 99-217 (La. App. 5 Cir. 7/2/99), 740 So.2d 768; and *State v. Spitz*, 93-2070 (La. App. 1 Cir. 12/22/94), 650 So.2d 271, *writ denied*, 95-742 (La. 9/1/95), 658 So.2d 1269.[22]

Here, defendant generally asserts that his convictions for aggravated kidnapping are excessive. In G*raham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the Supreme Court found that the life sentence for juvenile offenders convicted of non-homicide offenses was not unconstitutional. Furthermore, the mandatory life sentence for aggravated kidnapping has been upheld as constitutional. *See Gibson*, 197 So.3d at 700.

---

[22] These cases do not involve a defendant who was a juvenile at the time of the offenses, however.

In addition, while defendant generally asserts that his sentences are excessive, he did not specifically request a downward departure under *Dorthey*.[23] Even if he had done so, however, defendant has not rebutted the presumption that the mandatory minimum sentence is constitutional by clear and convincing evidence that he is exceptional so as to justify a downward departure. The trial court's imposition of the mandatory life sentence is supported by the relevant jurisprudence. *See*, *e.g.*, *State v. Barrett*, 51,921 (La. App. 2 Cir. 4/11/18), 247 So.3d 164, 168-72, *writ denied*, 18-744 (La. 2/18/19), 265 So.3d 770 (finding that La. R.S. 14:42(D) mandated the imposition of a life sentence for an aggravated rape conviction).

Further, defendant asserts that because he is a juvenile offender, he was entitled to parole eligibility after twenty-five years pursuant to La. R.S. 15:574.4(D). In *Graham*, the United States Supreme Court held that the Eighth Amendment precludes sentencing a juvenile to life imprisonment without the possibility of parole for a non-homicide offense. 560 U.S. at 82. Following *Graham*, the Louisiana Supreme Court held that the appropriate remedy for sentences of life without parole under *Graham* is to delete the restriction on parole eligibility. *State v. Shaffer*, 11-1756 (La. 11/23/11), 77 So.3d 939, 942. In such cases, the juvenile defendant must be given "some meaningful opportunity to

---

[23] In *State v. Dorthey*, 623 So.2d 1276 (La. 1993), the Louisiana Supreme Court recognized that a mandatory minimum sentence under the Habitual Offender Law may still be reviewed for constitutional excessiveness. In *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So.2d 672, 676, the Louisiana Supreme Court re-examined *Dorthey* and outlined the criteria a defendant must meet in order to show that a mandatory minimum sentence under the Habitual Offender Law is constitutionally excessive. In order to rebut the presumption that a mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that he is "exceptional, which ... means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." *Johnson*, 709 So.2d at 676. A sentencing court should exercise its authority to declare excessive a mandatory minimum sentence only under rare circumstances. *State v. Lindsey*, 99-3302 (La. 10/17/00), 770 So.2d 339, 345, *cert. denied*, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001).

obtain release based on demonstrated maturity and rehabilitation." *Id*. at 941

(quoting *Graham*, 560 U.S. at 75, 130 S.Ct. at 2030). The *Shaffer* court concluded:

> We therefore amend the sentence of [defendant] to delete the restriction on parole eligibility…We reiterate that this Court is not ordering relators released on parole. The determination of whether relators may be released on parole falls within the exclusive purview of the Board of Parole, charged with the duty of ordering parole "only for the best interest of society, not as an award of clemency." La. R.S. 15:574.4.1(B). Access to the Board's consideration will satisfy the mandate of *Graham*.

*Id*. at 942-43.

Here, in accordance with *Graham* and *Shaffer*, the appropriate remedy for

defendant's sentences of life imprisonment without parole on counts one and two

is to amend the life sentences to make defendant eligible for parole consideration

pursuant to the criteria set forth in La. R.S. 15:574.4(D). Accordingly, the

Department of Corrections is ordered to revise defendant's prison master. *See*

*Barrett*, 247 So.3d at 172 (modifying the life sentence to make the defendant

eligible for parole consideration under the criteria set forth in La. R.S. 15:574.4(D),

and ordering the Department of Corrections to revise the defendant's prison master

to reflect that his sentence is no longer without benefit of parole); *State v. Jenkins*,

15-1694 (La. App. 1 Cir. 4/15/16), 193 So.3d 1175, 1178 (same).

Aggravated Burglary (count three)

Defendant was convicted on count three of aggravated burglary in violation

of La. R.S. 14:60. The penalty for aggravated burglary is imprisonment at hard

labor for not less than one nor more than thirty years. La. R.S. 14:60. The trial

court sentenced defendant to the maximum thirty-year sentence at hard labor

without benefit of parole, probation, or suspension of sentence.

Maximum sentences have been upheld for similarly situated defendants. For

example, in *State v. Williams*, 01-998 (La. App. 3 Cir. 2/6/02), 815 So.2d 908, 915-

16, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59, the Third Circuit affirmed the

defendant's thirty-year sentence for his aggravated burglary conviction. The trial court found that the defendant used threats against the victim, he knew or should have known that the 80-year-old victim was vulnerable or incapable of resistance, and the defendant's actions in leaving the victim in the trunk of her car manifested deliberate cruelty to the victim. The Court held that the defendant did not present any substantial indication that the trial court abused its discretion when it imposed a sentence of thirty years. The Court further held that the trial court complied with La. C.Cr.P. art. 894.1, and the record reflected sufficient consideration was given to the codal guidelines for sentencing. *See also State v. Johnson,* 99-385 (La. App. 1 Cir. 11/5/99), 745 So.2d 217, 220, *writ denied sub nom. State ex rel. Johnson v. State,* 00-829 (La. 11/13/00), 774 So.2d 971 (affirming sentences of thirty and fifty-five years at hard labor, respectively, for aggravated burglary and armed robbery, as well as a consecutive ten-year sentence for armed robbery, imposed against a 15-year-old first-felony offender).

The Louisiana Supreme Court has repeatedly stated "that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Savoy*, 11-1174 (La. 7/2/12), 93 So.3d 1279, 1283. On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. *State v. Walker*, 00-3200 (La. 10/12/01), 799 So.2d 461, 462.

As the trial court stated at sentencing, this was a heinous offense in which defendant terrorized the elderly victims, whom he knew through his prior employment at their home. Defendant admitted that he targeted them because they were vulnerable and because he believed they had money. The trial court articulated detailed reasons for the sentences imposed. On review, we cannot say

that the trial court abused its discretion in imposing the maximum sentence on count three.

Defendant further argues that his sentence on count three is excessive because he was a juvenile and thus is entitled to parole eligibility as a juvenile offender pursuant to La. 15:574.4(J). We find that the trial court should not have restricted the benefits as to defendant's sentence for aggravated burglary, because La. R.S. 14:60 does not provide for such restrictions.[24] When a sentencing error involves the imposition of restrictions beyond what the legislature has authorized in the sentencing statute, a court of appeal should correct the sentence on its own authority under La. C.Cr.P. art. 882. *State v. Sanders*, 04-17 (La. 5/14/04), 876 So.2d 42.

Accordingly, the sentence imposed against defendant on count three is hereby corrected to delete the restriction of benefits. The matter is remanded for the correction of the uniform commitment order (UCO) to correctly reflect no restrictions of benefits, as set forth above. The trial court is ordered to transmit the original of the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. *See State v. Shelby*, 18-185 (La. App. 5 Cir. 12/27/18), 263 So.3d 1218, 1222-23.

**Errors Patent**

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). In addition to the sentencing issues discussed in assignment of error number three, the sentencing minute entry reflects that defendant was properly advised pursuant to La. C.Cr.P. art. 930.8,[25] but the transcript does not

---

[24] La. R.S. 14:60(B) provides, "Whoever commits the crime of aggravated burglary shall be imprisoned at hard labor for not less than one nor more than thirty years."

[25] La. C.Cr.P. art. 930.8 provides that a defendant shall have two years after the judgment of conviction and sentence has become final to seek post-conviction relief.

reflect that defendant was so advised. Where there is a discrepancy between the transcript and the minute entry, the transcript generally prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983). It is well settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief in its opinion. *State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008, 1023. Accordingly, defendant is hereby advised that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. *Id.*

## DECREE

For the foregoing reasons, the judgment on defendant's convictions is affirmed. The sentences imposed for the aggravated kidnapping are amended to acknowledge that defendant is eligible for parole consideration pursuant to the criteria set forth in La. R.S. 15:574.4(D), and the Department of Corrections is ordered to revise defendant's prison master to reflect that his sentences on counts one and two are no longer without benefit of parole. The sentence imposed for count three is corrected to remove the restriction on benefits, and the matter is remanded for the correction of the uniform commitment order (UCO) to correctly reflect no restrictions of benefits. The trial court is ordered to transmit the original of the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. Lastly, defendant is hereby notified, pursuant to La. C.Cr.P. art. 930.8, that no application for post-conviction relief shall be considered if filed more than two years after the judgment of conviction and sentence has become final.

**CONVICTIONS AFFIRMED;
SENTENCES AMENDED AND CORRECTED,
MATTER REMANDED, PER INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 29, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-KA-161

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE FRANK A. BRINDISI (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          ROGER W. JORDAN, JR. (APPELLANT)

### MAILED
ARTHUR O. SCHOTT, III (APPELLANT)
IVAN A. ORIHUELA (APPELLANT)
ATTORNEYS AT LAW
3213 FLORIDA AVENUE
SUITE C
KENNER, LA 70065

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053